UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 3:20-cr-86-TJC-JBT

JORGE PEREZ, et al.

## UNITD STATES' OPPOSITION TO DEFENDANTS CHRISTIAN FLETCHER AND AARON DURALL'S MOTION TO DISMISS

The United States hereby opposes Defendants Christian Fletcher and Aaron Durall's Motion to Dismiss the Indictment ("Motion") (D.E 212). Defendant Ricardo Perez has adopted the Motion (D.E. 223).

## PRELIMINARY STATEMENT

The Motion should be denied because its central premise—that the Government does not allege false statements or material omissions in the Superseding Indictment—is wrong. The Superseding Indictment makes specific allegations of fraud against each Defendant, tracking the statutory language. Moreover, this is not, as Defendants suggest, a civil dispute about the scope of health insurance contracts. The Government does not allege that Defendants honestly but incorrectly sought reimbursement for services that turned out to be outside insurance coverage. Rather, the Government accuses Defendants of lying in various ways to obtain money—the essence of a fraud charge. Finally, the Motion invites this Court to make a pre-trial ruling on the ultimate factual issues in this case:  whether

Defendants lied to the insurance companies via claims to obtain larger reimbursements for urine drug and blood laboratory tests for patients with no connection to the hospitals and without identifying the out-of-network labs that actually performed the testing, and whether these tests were even medically necessary. Defendants improperly ask this Court to diverge from the well-settled rule that "[t]here is no summary judgment procedure in criminal cases." *United States v. Salman*, 378 F.3d 1266, 1267 (11th Cir. 2004) (per curiam).

In straightforward terms that track the statutory language, in its charges of conspiracy to commit health care fraud and wire fraud, conspiracy to commit money laundering, and substantive counts of each, the Superseding Indictment provides all that is required under the law as a matter of notice pleading. For this reason alone, Defendants' Motion should be denied. It is that simple.

The Government alleges that Defendants seized control of four small rural hospitals to use as billing hubs in order to exploit their favorable reimbursement rates; arranged to procure urine and blood samples from patients across the country with no connection to these rural hospitals; and arranged to have testing on those samples performed at out-of-network independent laboratories, the identities of which were never divulged to the insurers. Defendants submitted claims for reimbursement falsely representing that the urine and blood testing was associated with patients from these rural hospitals, and was therefore reimbursable under contracts with favorable reimbursement rates. Defendants omitted the material facts that a substantial amount of testing was actually performed at the out-of-network

(also known as non-par) independent laboratories that would not have received reimbursement. Finally, Defendants falsely represented that the repetitive and even at times farcical testing was medically justified. Accordingly, each time a claim was submitted, a materially false statement was made. The insurers would not have paid for the testing had they known the true nature of it.

The Superseding Indictment does not allege that the claims were not payable simply because the insurers did not envision paying them, as Defendants characterize it. Instead, the "essence of the indictment" (Motion at 3) is the making of knowingly false statements and omissions to secure reimbursements that would not otherwise have been paid absent Defendants' lies that the testing was connected to the rural hospitals, and that all the tests were medically necessary.

Seeking to trivialize the scope of the alleged fraud by casting it as a civil matter, Defendants contend that they are charged with merely "filing a claim that is not payable," and contend the Government is criminalizing a contract dispute. Motion at 5-6. The specific allegations in the Superseding Indictment show that this is not true. A civil contract dispute presupposes a truthful description of the nature of the damages, and the basis for the claim; the fight is over what is covered. Here, in stark contrast, the Government alleges that Defendants made *materially false statements and omissions* in submitting the claims. That is fraud.

## BACKGROUND AND THE SUPERSEDING INDICTMENT

As outlined in the Superseding Indictment, this case involves a wide-ranging billing fraud scheme targeting private insurers in which rural hospitals in several

states were used as "shells" through which to submit claims for expensive and unnecessary urine drug and blood tests conducted at independent laboratories. The scheme was designed to take advantage of the fact that many rural hospitals had in-network contracts under which private insurers provided higher reimbursement rates for laboratory testing than they would have provided to independent laboratories that were out of the insurers' networks. *Id.* at ¶¶ 15, 21, 28-30, & 34.

To take advantage of this higher reimbursement rate, the conspirators sought out and acquired control over the hospitals for the sole purpose of billing lab claims under the in-network contracts. The laboratory tests were billed through the rural hospitals even though very little of the testing took place at the hospitals, and, more critically, despite the fact that none of the individuals whose specimens were tested received treatment at or otherwise had any connection to the hospitals. As set forth in the Manner and Means section of Count One, the claims submitted by Defendants under the hospitals' billing credentials were fraudulent in four main ways: (1) they used the hospitals' National Provider Identifier (NPI) number and tax ID, even though the tests often were performed by independent laboratories; (2) they falsely represented that the testing had some connection to the hospital when it did not, (3) they omitted any mention of the independent labs where much of the actual testing took place, and (4) many of the claims were for medically unnecessary testing.

The scheme started in May 2015 when Defendants Jorge Perez and Seth Guterman, operating through People's Choice Hospitals ("PCH"), obtained control over Campbellton-Graceville Hospital ("Campbellton-Graceville"), a rural Critical

Access Hospital ("CAH") in the Florida panhandle that was on the brink of financial failure. Superseding Indictment ¶¶ 1, 3, 15, 21, & 37. Several months later, Jorge Perez and Guterman, and others, began using Campbellton-Graceville to operate the fraudulent billing scheme. *Id.* at ¶¶ 35, 36, 37b(i), & 37c.

Jorge Perez and Guterman struck deals with the owners of independent labs, including co-conspirators Aaron Durall (owner of Reliance Labs in South Florida), and Christian Fletcher (owner of Lifebrite Labs in Atlanta), and others, to bill urine drug tests ("UDTs") conducted at the labs through Campbellton-Graceville. *Id.* ¶¶ 4, 5, 7, 21, 37g, 37j – 37l. The claims were submitted by Jorge Perez's company Empower, on behalf of Campbellton-Graceville, to various insurers, including Florida Blue, UHC and Aetna, purportedly under the insurers' contracts with Campbellton-Graceville—but without identifying the independent labs where most of the tests were performed. *Id.* at ¶¶ 1, 2, 28, 32, 33, 35, & 37c. Recruiters brought in by Jorge Perez, Durall and others, including Defendants Alonzo and Rojas and co-conspirator Kyle Marcotte (who pleaded guilty to the promotional money laundering conspiracy), sometimes working through networks of lower-level recruiters, solicited urine specimens from doctors' offices, sober homes, and drug treatment facilities all over the United States, typically paying some form of a kickback to obtain the specimens. *Id.* at ¶¶ 4, 9, 10, 13, 37b(iv), 37g – 37i, & 37m. The specimens were supplied by patients who never visited Campbellton-Graceville or had any connection thereto. *Id.* at ¶ 37g. After receiving the claims, the insurers sent reimbursements to Campbellton-Graceville. Most of the money was further

disbursed to accounts controlled by Defendants Durall, Fletcher, Jorge Perez, and others. *Id.* at ¶ 37l & 37p. Very little money was left for Campbellton-Graceville.

The billing scheme ended at Campbellton-Graceville in the summer of 2016 after Florida Blue began an investigation of claims. Defendant Durall then began obtaining control of rural hospitals. In August 2016, Durall purchased Chestatee Regional Hospital ("Chestatee"), a 49-bed rural hospital in Dahlonega, Georgia, and oversaw a pass-through billing scheme there. *Id.* ¶¶ 4, 17 -18, & 37e. Durall later used a billing company, Medivance, to submit claims to the insurers. *Id.* at ¶¶ 8, 17, & 37d. At Chestatee, Durall controlled both the hospital and the lab (Reliance) that performed much of the testing. *Id.* at ¶¶ 4 & 17. Durall and others caused millions of dollars' worth of UDTs to be billed out of Chestatee using Chestatee's NPI number and Tax ID. *Id.* at ¶¶ 37e, 37k, 37m, & 37o. As at Campbellton-Graceville, the patients who provided the UDTs had no connection to Chestatee and there was no mention of Reliance performing the testing.

With no ability to squeeze more money out of insurers using Campbellton-Graceville, Jorge Perez and other defendants, including Fletcher, moved on to engage in pass-through billing at new hospitals, including Putnam County Memorial Hospital in Missouri, and Regional General Hospital in Williston, Florida. *Id.* ¶¶ 19, 37f, 37g, 37k, 37l. Campbellton-Graceville reaped no benefit from the billing done in its name, and in 2017 it declared bankruptcy and closed. *Id.* ¶ 15.

Insurance company representatives will testify that there is no valid reason for a patient's urine sample to be shipped from California, tested at an independent lab

in Miami or Atlanta, and billed through a rural hospital in northwest Florida or north-central Missouri. Given their contractual agreements with the hospitals, they would not have paid the claims if they had known the tests were performed at out-of-network independent labs for patients with no connection to the hospitals, or if they had known they were being billed for excessive and medically unnecessary testing. Nor would they have paid claims for any testing performed at the hospitals, where the specimens were sent there for the sole purpose of maximizing insurance recovery under the hospitals' in-network contracts. Insurers will clarify that their contracts with the rural hospitals, as written, covered services provided at the hospitals' labs for inpatients and outpatients *of the hospital*. In the rare circumstance in which a hospital inpatient or outpatient needed a test that could not be done at the hospital lab, the specimen could be referred out to another laboratory and the insurer would reimburse the test at the hospital's contracted rate. Likewise, in the rare circumstance in which a non-patient of the hospital (*i.e.*, someone who lived in the surrounding community) needed a test performed at the rural hospital lab, that test would be reimbursed at the hospital rate.

In contrast, the Government will show that Defendants solicited samples from patients throughout the United States unconnected to the rural hospitals, arranged for the testing to be performed at one of the independent labs (or occasionally at the hospital lab), and then used the hospitals solely as vehicles to obtain the higher insurance reimbursement available under the in-network contracts, thus maximizing revenue by lying to conceal the true nature of the tests. *Id.* ¶¶ 37a, 37b, 37f, 37g, &

37j.[1] Overall, the scheme involved over $1.4 billion of claims originating from the pass-through billing scheme at the four rural hospitals, with insurance companies paying over $400 million in claims. *Id.* at ¶ 37t.

For their part in this scheme, Defendants are charged with a health care fraud and wire fraud conspiracy in Count One. Counts Two through Six charge Durall with substantive healthcare fraud counts. The chart in the execution portion on pages 19 and 20 identify the specific claims at issue, including the date of the claim, the initials of the beneficiary (full name provided separately to defense counsel), the claim number, the amount billed, amount paid, and the identity of the insurer (Florida Blue for all six counts). Count Seven charges Durall with a dual object money laundering conspiracy. Count Eight charges Fletcher and others with a section 1957 money laundering conspiracy. Counts Nine and Ten charge Durall with substantive promotional money laundering counts. Count Twenty-Three charges Durall with substantive section 1957(a) money laundering counts; Fletcher is charged with these same offenses in counts Fifteen and Eighteen.

## LEGAL STANDARD

Under Rule 7(c)(1) of the Federal Rules of Criminal Procedure, an indictment must be a "plain, concise, and definite statement of the essential facts constituting the

---

[1] These insurers will further testify that the inclusion in some billing submissions of a billing code "141" in the claim—to purportedly identify non-hospital patients—did not make such claims permissible, as the submission of the claims on behalf of the hospitals was a representation that the testing had some connection to the hospitals (and was therefore reimbursable under the hospitals' in-network contracts) when the opposite was true: the rural hospitals were used as billing hubs, not as locations to provide health care.

offense charged[.]" An indictment is "legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009).

Courts analyzing challenges to the sufficiency of an indictment should "give the indictment a common-sense construction, and its validity is to be determined by practical, not technical, considerations." *United States v. McGarity*, 669 F.3d 1218, 1235 (11th Cir. 2012) (internal quotation omitted). The appropriate test is "not whether the indictment might have been drafted with more clarity, but whether it conforms to minimal constitutional standards." *Id*. at 1235–36 (internal quotation omitted). For an indictment to pass constitutional muster, it must at a minimum set forth the essential elements of the offense. *United States v. Gayle*, 967 F.2d 483, 485 (11th Cir. 1992) (en banc). Reference to the statute adequately informs the defendant of the nature and cause of the action as the Sixth Amendment mandates, and "if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds." *United States v. Fern*, 155 F.3d 1318, 1325 (11th Cir. 1998); *see also Jordan*, 582 F.3d at 1246 ("[a]n indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused").

"It is well-settled that a court may not dismiss an indictment … on a determination of facts that should have been developed at trial." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). Indeed, "'[t]here is no summary judgment procedure in criminal cases' and the Federal Rules of Criminal Procedure do not 'provide for a pre-trial determination of sufficiency of the evidence.'" *United States v. Brantley*, 461 Fed. Appx. 849, 851 (11th Cir. 2012) (quoting *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992)); *see also Salman*, 378 F.3d at 1268 ("A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases because there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure."). Instead, whether a defendant's conduct violates a criminal statute is for the jury to decide. *Singer v. United States*, 380 U.S. 24, 35 (1965).

## ARGUMENT

Defendants' Motion is akin to a motion for summary judgment before trial, and thus can be summarily denied. The Superseding Indictment charges a fraud scheme, and not a particularly hard one to grasp. Defendants intentionally made material misstatements and omissions each and every time they filed a claim for lab tests that necessarily purported to be medically necessary (when they often were not), for tests ostensibly done at the rural hospitals that billed from (often not the case), for patients connected to the hospital (virtually never true). Under Defendants' argument, the Government could never go to trial in a health care fraud case, as Defendants could simply submit a motion to dismiss asserting that they thought the

services were covered, resulting in dismissal. Nor can Defendants defend their

conduct through supposed unnamed ambiguities in the insurance contracts; the

contracts were clear in that they applied to *actual services provided to patients of the rural*

*hospitals*, and, in any case, Defendants repeatedly lied to the insurers. Dismissing an

indictment at this stage of the case is improper; factual disputes and questions of

criminal intent are to be resolved at trial by the jury. Defendants' Motion is meritless,

and amounts to just a lengthy recitation of their likely intent (and other) defenses at

trial and their arguments for a Rule 29 motion after the Government completes its

case in chief. But today is not the day for those arguments.

### A.    The Indictment Adequately Alleges Fraudulent Misrepresentations

The Superseding Indictment easily satisfies the requirements for notice

pleading. It alleges that all Defendants participated in a conspiracy to commit wire

fraud and health care fraud, and additionally charges Durall with five counts of

substantive health care fraud. It charges Fletcher and Durall with different money

laundering conspiracies, as well as substantive money laundering offenses.[2]

---

[2] Although Defendants move for dismissal of the entire Superseding Indictment, their arguments concern only an alleged deficiency in the allegations of fraud, and therefore apply only to Count One (Conspiracy) and Counts Two through Six (Health Care Fraud). Wire fraud and health care fraud are the specified unlawful activities (SUAs) that support the money laundering charges, but the Government need not prove that a defendant actually engaged in the underlying SUA to obtain a conviction for money laundering. *See United States v. Martinelli*, 454 F.3d 1300, 1311 (11th Cir. 2006) (jury did need to be instructed on elements of mail fraud where that was the SUA supporting money laundering conspiracy charge; defendant only had to know the funds were derived from the SUA of mail fraud). Thus, even if the fraud-based charges were dismissed, the money laundering counts would remain.

Each count in the Superseding Indictment (including the objects of the health care and wire fraud conspiracy) tracks the language of the statutes charged, and the General Allegations and Manner and Means section of Count One provide Defendants with detailed notice of the alleged offense conduct, which is all that is required under the law. The Government need not allege all details of the crimes Defendants are charged with in order to satisfy due process requirements. In any event, the Superseding Indictment clearly lays out specific acts taken by Defendants in furtherance of the charged health care and wire fraud conspiracy, the money laundering conspiracy, and the substantive counts. Moreover, Defendants received extensive discovery and grand jury transcripts, as well as two expert reports; they therefore have ample notice of not only the charges they face, but the proof.[3]

The Superseding Indictment more than adequately pleads fraudulent misrepresentations and material omissions—the only element of the fraud charges that Defendants claim is missing.[4]  It alleges that numerous private insurers had

---

[3] Defendants also benefitted from the Government laying out its theory of prosecution in several pre-indictment meetings that, among other things, were to explore the possibility of a plea. Incredibly, to bolster their case, they quote out of context a purported remark made at one of these conferences by one of the undersigned prosecutors. This is improper under Rule 11. In any case, it is irrelevant, as the Superseding Indictment speaks for itself.

[4] The elements of the fraud charges in this case are not complicated. Wire fraud occurs when a defendant intentionally participates in a "scheme to defraud" and uses the interstate wires to further that scheme. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir 2009). A "scheme to defraud" occurs where there is "a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id*; *see also United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009). A misrepresentation or omission "is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." *Id.; United States v. Hasson*, 333 F.3d 1264, 1271 (11th Cir. 2003) (holding that misrepresentations about the "physical characteristics" of jewelry that the defendant was selling was a material representation supporting wire fraud liability). "Medicare claims may be false if they

contracts with the four rural hospitals under which they agreed to reimburse the hospitals for "providing a defined set of health care items and services, including laboratory testing services." Superseding Indictment ¶ 33. The insurers agreed to pay only for services that were medically necessary and actually rendered, among other things. *Id.* at ¶ 34. That did not happen, and that is fraud.

Indeed, the Superseding Indictment specifically alleges fraud in a clear and concise manner against Durall and Fletcher, which makes their fundamental argument puzzling. Durall (and others) obtained control over the rural hospitals through various means. Superseding Indictment ¶ 37(b). Durall, Fletcher, and other defendants owned independent clinical testing laboratories. *Id.* at ¶ 4, 5, 7. Defendants arranged for the independent labs to obtain urine and blood samples from individuals who were not patients of the rural hospitals, test them (*id.* at ¶ 37(g)), and then seek reimbursement from the insurers using the hospitals' "NPI and other identifying information"—"as though the testing was reimbursable under the Rural Hospitals' insurance contracts with the Private Insurers and other third-party payors, when in truth and in fact, it was not." *Id.* at ¶ 37(g). The Superseding Indictment explains that these claims were materially false and fraudulent in that

---

claim reimbursement for services or costs ... that ... are not reimbursable...." *United States v. R & F Props. of Lake County, Inc.,* 433 F.3d 1349, 1356–57 (11th Cir. 2005); the same is true of claims submitted to private insurers. And as for the conspiracy allegations: "[T]he government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy. Rather, the Government must only prove, beyond a reasonable doubt, that the defendant knew of the essential nature of the conspiracy." *United States v. Gonzalez,* 834 F.3d 1206, 1215 (11th Cir. 2016) (internal quotations and citations omitted). *See also* Eleventh Circuit Criminal Pattern Jury Instructions, Offense Instruction 54.

they were purportedly submitted by the hospitals under their contracts, "under which reimbursement was available for testing performed for hospital patients," when in reality the tests were not medically necessary, and the tests were not reimbursable under the contracts. *Id*. at ¶ 37(k). What more do Defendants want?[5]

In deciding Defendants' Motion, the Court must accept the Superseding Indictment's factual allegations as true and may not look "beyond the face of" the Superseding Indictment to the sufficiency of the evidence against the Defendants. *Salman*, 378 F.3d at 1267-69. Defendants make unsupported and conclusory assertions about what is reimbursable under the contracts that are inconsistent with the allegations. They claim that the rural hospitals are entitled to reimbursement for screening tests performed at the hospital, and then go one step further, saying hospitals are entitled to reimbursement for confirmatory tests performed *outside* the hospital simply because the hospital paid an independent, out-of-network lab to perform the test. Motion at 8. Such circular arguments without any basis in fact are

---

[5] Moreover, although there was no obligation for the Government to do so, the Superseding Indictment sets out facts that describe what motivated this particular fraud scheme. It alleges that providers with which the insurers had contracts were "in-network" and received substantially higher reimbursement rates for the services they provided than "out-of-network" providers without contracts. Superseding Indictment ¶ 32. The insurers provided high rates of reimbursement to in-network rural hospitals to ensure that the hospitals remained financially viable and that the insurers' subscribers in those areas had access to medical care. *Id*. at ¶ 34. The false claims seeking reimbursement for the rural hospitals—when most tests were actually performed at out-of-network independent labs—were designed to take advantage of the rural hospitals' high in-network reimbursement rates that would not have been paid had the independent labs truthfully submitted claims directly to the insurers. *Id*. at ¶ 37(l). A portion of the reimbursements to the hospitals was transferred to the independent lab owners, including Defendants Fletcher and Durall (*id*. at ¶ 37(n)) so that the independent lab owners obtained the benefit of the higher, in-network reimbursement rates that the insurers had agreed to pay for medically necessary tests by the hospitals for services provided to hospital patients.

directly at odds with the Superseding Indictment, which alleges that the insurers agreed to reimburse *the hospitals* for providing medically necessary services, including laboratory tests. Superseding Indictment ¶¶ 33, 34.

The more fundamental problem with Defendants' Motion is that they improperly invite the Court to rule pre-trial on the ultimate factual question in this case: whether the defendants fraudulently billed the laboratory tests. By teeing up a factual dispute for pre-trial resolution, Defendants improperly ask the Court to diverge from the well-settled rule that "[t]here is no summary judgment procedure in criminal cases." *Salman*, 378 F.3d at 1267. They can move for a Rule 29 dismissal after the Government presents its evidence. They cannot simply dispose of the case now.

While the allegations of false representations and omissions about the nature of the testing would be enough to satisfy the fraud element of a wire fraud or health care fraud claim, the Superseding Indictment also alleges that Defendants sought reimbursement for medically unnecessary testing—a classic brand of fraudulent misrepresentation and enough to prove heath care fraud on its own. *See United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).[6]  Defendants address this aspect of the Superseding Indictment only glancingly in one paragraph, asserting as a matter

---

[6] A health care fraud conspiracy exists when defendants agree to submit false claims to health care benefit programs; the defendants must have known that the claims submitted were actually false. *Gonzalez*, 834 F.3d at 1214. "A person makes a false claim if the treatments that were billed were 'not medically necessary[ ] or were not delivered to the patients.'" *Id.* (quoting *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007)).

of law that because lab owners cannot be held responsible for determinations of medical necessity, they cannot be charged with making false representations of necessity. Motion at 6. But if Defendants *knew* the testing was not medically necessary and participated in a conspiracy to submit claims for that testing to the insurers, it is immaterial whether laboratories had some independent responsibility to make medical necessity determinations in the first instance. Defendants' knowledge, of course, can be shown by circumstantial evidence. *United States v. Molina*, 413 F. App'x 210 (11th Cir. 2011) (per curiam) ("Conspiracy may be proven by circumstantial evidence and the extent of the defendant's knowledge of details in the conspiracy does not matter if the proof shows that he knew the essential objective of the conspiracy."). At this stage, however, it is sufficient for the Government to allege that the testing was medically unnecessary, and that Defendants or their co-conspirators lied about that when they caused claims to be submitted to the insurers. The Superseding Indictment amply does that.

Defendants cite several cases in an effort to show the fraud allegations are insufficient, but all are inapposite. In *United States v. Bobo*, 344 F.3d 1076 (11th Cir. 2004), an indictment charging conspiracy to commit health care fraud neglected to allege that the fraud was in connection with the delivery or payment or health care items, benefits, and services, as required under 18 U.S.C. § 1347, and it even failed "to specify of what precisely [the defendant] was allegedly trying to defraud the victim of: benefits, items, services, or money." *Id.* at 1084. The Superseding Indictment, in contrast, is clear: the fraud was geared toward depriving the private

insurers of money and property, specifically, the money they paid in reimbursements to the hospitals based upon the misrepresentations in the insurance claims. In *United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011), certain counts in the indictment were deficient where the indictment "provide[d] absolutely no factual detail regarding the scheme to defraud the [victim]." *Id.* at 1261. The Superseding Indictment, on the other hand, is replete with factual detail about the nature of the fraud scheme in the Manner and Means section of Count One. That detail is expressly incorporated into Counts Two through Six.

In *United States v. McGarity*, 669 F.3d 1218 (11th Cir. 2012), a prosecution for obstruction of justice, the indictment failed to identify the official proceeding that was the subject of the obstruction, and in *United States v. Martinez*, 800 F.3d 1293 (11th Cir. 2015), the indictment failed to allege the defendant had acted with the requisite knowledge. Here, there are no such glaring omissions.

*United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), is even farther afield. The relevant part of that case involved a prosecution under a very specific portion of the false statements statute that criminalizes the making of a "false writing or document." 18 U.S.C. § 1001(a)(3). The defendant had submitted to the government subcontracts with another firm to demonstrate that his company had the means to perform work on behalf of the government, but neither the defendant nor the counterparty had any intent of performing under the contracts. The Eleventh Circuit held that this could not amount to making a "false writing or document," because the contracts were neither forged nor contained factual misrepresentations;

while the parties did not intend to carry through on their contractual promises, this did not make the *contracts themselves* false— and that was the only question before the court. The present case, unlike *Blankenship*, is not about whether the contracts between the hospitals and the insurers were "false"; rather, as the Superseding Indictment alleges, Defendants caused materially false representations and omissions to be made to the insurers to induce them to pay benefits they would not otherwise have paid.

*United States v. McCarrick*, 294 F.3d 1286 (11th Cir. 2002), another case cited prominently by Defendants, is also distinguishable because it says nothing about the line between breach of contract and criminal fraud. *McCarrick* did not even involve a contractual relationship, but was a garden-variety case of fraud and false statements in a loan application. The Eleventh Circuit concluded that there was insufficient evidence of the defendant's intent to defraud the bank at the time he applied for the loan, notwithstanding post-closing evidence that cast doubt on the defendant's ability to engage in the business operations for which he had sought the loan. *McCarrick* is simply a case about the failure of proof; nothing in the opinion suggests that the fraud theory the Government pursued was deficient as a legal matter.

The allegations of fraud in the Superseding Indictment are not conceptually different than in the typical criminal Medicare fraud case in which the Government alleges that a provider made false representations to the Government to obtain payment for items and services that were ineligible for reimbursement under Medicare's Local Coverage Determinations ("LCDs") because the beneficiaries did

not qualify for the services, and/or the services provided were medically unnecessary. Medicare providers enter into an agreement (akin to a contract) in which they agree to abide by all the coverage rules of Medicare, and Medicare in turn agrees to reimburse for covered services. Medicare's LCDs define what Medicare will pay for, and false statements made to obtain reimbursements that would not otherwise be paid can constitute health care fraud. Allegations of lack of medical necessity and/or lack of qualifying patients *always* concern such coverage disputes over what Medicare will pay for, and no defendant can have an indictment dismissed pre-trial by simply asserting that he thought the services were covered by Medicare. If this were true, the Government could only bring Medicare fraud prosecutions alleging services not rendered. Such a claim of a defendant's intent must be settled at trial. Defendants' arguments in this case, taken to their logical extreme, would make all health care fraud prosecutions involving accusations of a lack of patient qualification and/or medical necessity invalid. This is not the law.

**B.** **Defendants Cannot Rely on "Ambiguities" in the Insurance Contracts**

Defendants assert that the charges of fraud must fail as a matter of law due to "ambiguity" in the insurance contracts. While Defendants may argue purported ambiguity in the contracts at trial, this is simply not a proper basis for dismissing an indictment pre-trial. Further, and crucially, Defendants do not explain how the contracts are ambiguous. They point to no language in any insurance contract that indicates reimbursement is available to the rural hospitals for testing the hospitals

19

arranged to have performed at out-of-network laboratories for patients from around the country with no connection to the hospitals.

The Government intends to offer proof at trial that the contracts quite clearly provide for reimbursement only for services provided by the rural hospitals themselves to patients of the hospitals—so that submitting claims for payment in the name of the hospitals, while omitting that services were provided elsewhere, amounted to an obviously materially false statement. Indeed, under Defendants' argument, any single patient with health insurance, anywhere in the United States, could have their specimens shipped to a small rural hospital to be tested and reimbursement would be available at the hospital's rates. This cannot be true.

In any event, the scope of coverage of the insurance contracts in this case is a factual issue that must be resolved at trial. The very cases Defendants cite confirm this. In *United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002), the defendants were convicted of making false statements to Medicare in cost reports by improperly classifying debt interest payments based on their use at the time the cost report was filed rather than at the time the debt was incurred. They contended that no Medicare regulation indicated their classification was incorrect, so their statements in the cost reports could not have been false. As the Eleventh Circuit framed the issued, "where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." *Id.* at 1351. This ruling reflects the commonplace proposition that the burden rests on the

Government to prove the falsity of a statement made to a government agency in view of the legal authority governing the nature of what is required to be said. In *Whiteside*, the Government could not meet that burden because no Medicare regulation or other authority clearly required the debt payments to be classified based on their use at the time of the loan. But the Government clearly had an opportunity to offer that proof at trial.

The tax decisions Defendants cite offer no support for the claim that the Superseding Indictment should be dismissed due to alleged ambiguity in the contracts. Prosecutions for tax evasion are unique in that the defendant must have signed the return "willfully and knowing it was false," 26 U.S.C. § 7206(1), which in turn means there must have been a "voluntary, intentional violation of a known legal duty." *United States v. Pirro*, 212 F.3d 86, 90 (2d Cir. 2000) (citation omitted). This raises a significantly higher bar than in a fraud prosecution, where there is no need for the Government to make a comparable allegation or offer of proof.[7]

Likewise, the rule of lenity invoked by Defendants has no application here, particularly in the setting of a motion to dismiss. The rule of lenity provides that

_____

[7] As explained in *Pirro*, "[o]ne of the most esoteric areas of the law is that of federal taxation. It is replete with full-grown intricacies, and it is rare that a simple, direct statement of the law can be made without caveat. .... [P]roof of guilt in such cases must be predicated upon a voluntary, intentional violation of a known legal duty." *Id*; *see also United States v. Harris*, 942 F.2d 1125, 1130 (7th Cir. 1991) (criminal tax prosecutions "must rest on a violation of a clear rule of law.... If "defendants [in a tax case] ... could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards") (quoting *United States v. Mallas*, 762 F.2d 361, 361 (4th Cir.1985)). Defendants appear to cite *Pirro* for the proposition that the principles in the tax evasion cases have been extended to cases involving allegedly ambiguous contractual provisions. Motion at 16. But *Pirro* did not involve a contractual relationship. 212 F.3d at 91 (portion of indictment was deficient because "tax law provided [the defendant] no notice that failure to report [information on a tax return] was criminal").

where it is unclear whether a criminal statute proscribes the defendant's conduct, the benefit of the doubt goes to the defendant and the Government may not prosecute that conduct. But Defendants have identified no basis for filing claims with insurance companies that contain the referenced material misrepresentations and omissions.

Surely *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004), cited by Defendants, does not support dismissal of the Superseding Indictment. There, the Government alleged in the indictment that individuals who had received stolen McDonald's game pieces fraudulently represented themselves to McDonald's as "legitimate" winners, who had received the pieces through authorized channels, when they sought to redeem their prizes. The evidence at trial showed, however, that it was permissible *even by McDonald's own rules* for individuals to obtain prizes if they did not receive the pieces through the three authorized channels alleged by the Government; as such, in the absence of any proof that the defendants knew the pieces were stolen, there was nothing false about the defendants' representations that they were "legitimate" winners. Here, the Superseding Indictment alleges that insurers had contracts with the rural hospitals in which they agreed to reimburse for medically necessary testing the hospitals performed for patients of the hospital. The Government has sufficiently alleged and will prove the nature of the material misrepresentations and omissions in the claims.

## C.    The Superseding Indictment Alleges a Scheme to Defraud

Defendants lastly argue based on *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *modified*, 838 F.3d 1168 (11th Cir. 2016), that the Superseding Indictment

alleges only an effort to "deceive" the insurers, not a scheme to defraud them. In *Takhalov*, the court of appeals clarified that, for a defendant to be convicted of wire fraud, he must engage in a "scheme to defraud," which means that the defendant "must intend to use deception to cause some injury" by depriving his victims of something of value as opposed to merely deceiving his victims without intending to cause them harm. *Id*. at 1312-13. Put differently, to engage in the requisite "scheme to defraud" the defendant must "lie about the nature of the bargain." *Id*. at 1313. The defendants in *Takhalov* hired "bar girls" to entice men to clubs, where they spent money on drinks and food. The only lie was about the bar girls' identity—they were not tourists, as they represented—but the men were not harmed in the sense that they obtained what they bargained for, namely, a visit to a club with the girls.

The scheme alleged in this case is not at all like the one in *Takhalov*. The Superseding Indictment alleges that the Defendants lied to the insurers in order to get payment for clams which the insurers would not have paid had they known the truth. The insurers had previously agreed to pay for medically necessary services provided by the hospital for patients of the hospital. The claims contained lies in that they falsely represented that services were provided by the hospitals for patients connected to the hospitals and were medically necessary. In this respect, the lies went to the essence of the bargain between the hospitals and the insurers. The Defendants' lies were about the "nature of the bargain" (*id.* at 1314), and not merely a deceptive representation about a collateral matter. Moreover, the alleged scheme was intended

23

to harm the victims, that is, to obtain, by deceptive means, something to which [the defendant] is not entitled." *Id*. at 1313 (internal quotation omitted).

To make this case look like *Takhalov*, the Defendants say that "if the government's contention is that there was some aspect of the insurance claim that was not accurate, but the insurance claim was still valid, the defendant's conduct is not fraudulent." Motion at 21. That assumes the conclusion. The Superseding Indictment does not merely allege technical defects in the claims; nor does it allege that the claims were "valid." That is Defendants' preferred view. This is a factual issue that the jury will resolve. *Salman*, 378 F.3d at 1267.

*United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), is instructive. There, the defendant participated in a fraudulent scheme to obtain construction contracts which were set aside for socially and economically disadvantaged companies. Although the defendant was ineligible for the contracts, in order to appear eligible, he made false representations that small businesses would operate with him as disadvantaged partners and perform commercially useful functions on those contracts. *Id.* at 1290. The defendant argued that he did not commit wire fraud "because, in the end, the County and the United States received the electrical work they sought." *Id.* at 1302. The Eleventh Circuit rejected that argument, finding that the issue of "financial loss is not at the core of these mail and wire frauds." *Id.* Through the scheme, construction contracts were awarded to ineligible companies. *Id.* "The County and the United States were free to prescribe the rules of this contracting process, and the defendant was not free to dishonestly circumvent

the worthy purpose of the set-aside programs." *Id.* at 1303. Likewise, the Superseding

Indictment alleges that the insurers were deceived by fraudulent misrepresentations

and omissions into paying non-payable claims. That is fraud.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion should be denied.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:   */s/ Tysen Duva*
TYSEN DUVA
Assistant United States Attorney
Florida Bar No. 0603511
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone:   (904) 301-6300
Facsimile:     (904) 301-6310
E-mail:   Tysen.Duva@usdoj.gov

DANIEL KAHN, ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:   */s/ James V. Hayes*
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
GARY A. WINTERS (FL Bar # A5501852)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20005
Tel: (202) 598-2382
Email: Gary.Winters@usdoj.gov
        James.Hayes@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 16, 2021, a true and correct copy of the foregoing was filed and served on all counsel via the CM/ECF system.

*/s/ Gary A. Winters*
GARY A. WINTERS
Trial Attorney
Criminal Division, Fraud Section
