UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 3:20-cr-86-TJC-JBT

JORGE PEREZ, et al.

### UNITED STATES' MEMORANDUM OPPOSING DEFENDANTS FLETCHER AND DURALL'S RULE 104(a) MOTIONS

The United States of America, via the undersigned, opposes Defendants Christian Fletcher and Aaron Durall's Motions for a Pre-Trial Rule 104(a) hearing to determine admissibility of insurance company claims data spreadsheets. (Docs. 448 & 450). The motions are built entirely on an assumption, unsupported by evidence or logic, that the insurers produced false or inaccurate spreadsheets that the government now intends to rely upon to prove the fraud charges. In fact, determining whether the claims data spreadsheets are authentic business records pursuant to Federal Rules of Evidence 803(6) and 902(11), and therefore admissible, is not a difficult task. In contrast to the defendants' confusing and misleading assertions about the data contained on these spreadsheets, witnesses from Florida Blue, Anthem, Aetna, and United Healthcare (UHC) will testify at trial that the claims data spreadsheets are prepared from information submitted by providers, as well as information generated by the insurers as part of the internal claims adjudication process, all of which is kept in the ordinary course of their insurance businesses. The witnesses will further testify

that the claims information is maintained in electronic databases known as "data warehouses" which are managed by employees who specialize in maintaining and extracting claims data, and that the preparation of the claims data spreadsheets from the claims data and claims adjudication process is a regular practice for each insurer. That is all the government must show to establish that the claims data spreadsheets are admissible as Records of a Regularly Conducted Activity under Rules 803(6) and 902(11). The defendants cannot (and will not be able to) show that the claims data spreadsheets themselves or the method of preparing the spreadsheets lack trustworthiness.

   The parties do not disagree on the general law pertaining to a Rule 104(a) hearing. The Court can hold one at its discretion. The government, however, disagrees with the premise of the motion, which is that information in the claims spreadsheets were altered, made up, or intentionally manipulated. The premise is contrived and false. To believe it, one would have to believe that all insurance companies that paid the alleged fraudulent laboratory claims identifying the four rural hospitals as the providers of the service made the same independent decision. That is, without communicating with each other, the insurance companies intentionally altered material information in the claims data, determined to pay claims the insurers would not otherwise have paid. Then, all the insurers independently decided to enlist the Justice Department to prosecute a fraud case based on made up or "altered" information, and all the prosecutors involved (and the grand jury) bought it and determined to proceed. With insurance companies

adjudicating tens of millions of claims per year, this theory about the insurers independently engaging in this conduct on this subset of lab claims from these four small rural hospitals is devoid of any common sense.

### A.  Rule 104 Hearings

The nature of the fraud allegations in this case is set forth in the government's response to Durall's Renewed Motion for Bill of Particulars (Doc. 477). The government incorporates that recitation by reference. The threshold question here is, what is a Rule 104(a) hearing designed to accomplish? While the Court has broad authority under Rule 104(a) to determine whether "a witness is qualified, a privilege exists, or evidence is admissible," Fed. R. Evid. 104(a), Rule 104(b) creates a category of questions that the Court tentatively decides, but that must ultimately be determined by the jury. If evidence passes the "preliminary assessment of authenticity, … the inquiry proceeds to a second step, in which 'the evidence may be admitted, and the ultimate question of authenticity is then decided by the [factfinder].'" *United States v. Mar. Life Caribbean Ltd.*, 913 F.3d 1027, 1033 (11th Cir. 2019) (*citing United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012)). In the first step, the Court determines if a reasonable jury could conclude that the evidence was authentic. *Id.*

Rule 104 is not a rule of exclusion. It is a process rule that favors admissibility if there is a reasonable construction in the offering party's favor. The Court can easily make that determination here without a hearing before (much less months in advance of) the May 9, 2022 trial.

### B.   Application to Claims Data Spreadsheets

The government obtained and produced claims data spreadsheets for claims submitted from the four rural hospitals (Campbellton-Graceville Hospital (CGH), Regional General Hospital – Williston (RGH), Putnam County Memorial Hospital (Putnam), and Chestatee Hospital (Chestatee)) to the insurance companies (Florida Blue, Anthem, Aetna, and UHC). The government also obtained and produced claims data spreadsheets for lab claims submitted by the independent labs owned by defendants (LifeBrite Labs, Pinnacle Labs, and Reliance Labs) directly to the insurers. The spreadsheets for the claims from the independent labs illustrate that a very small percentage of those claims were paid. That is because the independent labs were out-of-network and did not have contractual relationships with the insurance companies.

### 1. The claim process and creation of the claims data spreadsheet

The claims data spreadsheets include tens of thousands of entries for laboratory claims made to the insurance companies. Without the spreadsheets, it would be impossible to present the claims data in an understandable manner. The defendants have fashioned a theory out of whole cloth that the insurance companies altered the claims data before providing it to the government pursuant to a grand jury or trial subpoena. To understand the contrived nature of this allegation, an overview of the claims submission process — which ultimately results in the insurers storing claims data which can be retrieved and presented as a spreadsheet — is instructive. Witnesses from the insurers will testify to this process at trial.

Using Florida Blue and CGH as an example, the following is meant to track a typical claim submitted from CGH and ultimately to Florida Blue. An "institutional" or "facility" claim from a hospital provider (like the rural hospitals) is ordinarily submitted electronically in a standard format called 837I,[1] or in some instances on a UB-04 claim form. A professional claim (such as from an independent laboratory) is submitted on a CMS-1500 claim form. The alleged fraudulent claims in this case were institutional claims.

A claim for laboratory services from CGH (the listed hospital provider) is typically submitted to a front-end clearinghouse such as Waystar. The facility (CGH) has the relationship with that clearinghouse. The key information relevant to the claim being submitted is provided through the 837I format, including:

- Billing Provider Name and Address
- Billing Provider National Provider Identification Number (NPI – a unique number assigned to health care providers)
- Billing Provider Tax Identification Number (TIN)
- The name of the patient, along with the demographic information about the patient
- Information about the claim, such as the date of service, the diagnosis, and the nature of the service provided.

---

[1] The "837I Health Care Claim Institutional" is explained in footnote 2 of the Government's Response to Durall's Renewed Motion for Bill of Particulars (Doc. 477).

- The type of bill being submitted. This is explained further below in the context of the "141" code.

This information is passed through from the clearinghouse to the insurer. The clearinghouse's role does not include altering material information used by the insurer to adjudicate a claim. Rather, the clearinghouse's role is to transmit essential information about the nature of the healthcare encounter so that the insurance company can later adjudicate it. The first (or front end) clearinghouse ensures that all relevant information about the claim has been obtained from the listed provider (CGH in this instance) such that the claim can be submitted to Florida Blue's clearinghouse, which is Availity.

When Availity receives the claim, Availity performs what is known as gateway editing, which means Availity determines if there is a valid member listed on the claim (an actual insured of Florida Blue) and if there is a legitimate provider listed (CGH). If this information is incomplete, Availity sends the claim back to the first clearinghouse. If the information is complete, Availity sends the claim to Florida Blue. Availity has no role in claims adjudication. It does not change claim information. Availity is a filter to ensure the claim is complete and ready for adjudication by Florida Blue.

One piece of information in the original claim from the hospital to the clearinghouse that does change during this process is the "submitter" field that the defendants have emphasized in recent months. During the April 27, 2021 Motion Hearing and October 22, 2021 Status Conference, various defendants (including

Christian Fletcher) and non-party Mark Blake (during the April 27 hearing) made presentations and representations about the submitter field, and that it was somehow a key piece of information that put insurers on notice of the independent labs' involvement in conducting the laboratory tests. Other than perhaps Mark Blake (who now has a judgment of over $19 million against him after Anthem secured a favorable jury verdict against his laboratory Serodynamics in case no. 5:18-cv-06037-DGK in the Western District of Missouri)[2], the defendants have not (and cannot) put forth any witness to credibly testify that the submitter field has any relevance to the claims adjudication decision.

Government witnesses will testify, and the claims data spreadsheets will reflect, that the submitter field changes along the path of the claim from hospital to clearinghouse to insurer. This change is entirely normal. It does not represent any falsification or manipulation of claims data. The submitter field merely identifies who is sending the data to the next party in the chain, so the identity of the submitter in the insurance companies' spreadsheets is the clearinghouse, whereas when the claim is submitted *to* the clearinghouse, the submitter is the entity submitting the

---

[2] During the April 27, 2021 hearing when the Court permitted Mark Blake to present to the Court, Blake referred to a PowerPoint and supporting documents that he possessed as "The Pelican Brief" that "exposes everything." P. 54, line 10; P. 59, line 4. Blake was, in part, referring to documents purporting to show that defendants informed insurers through the submitter field that they had performed the lab testing billed through Putnam. In fact, as the evidence will show, the submitter field information has no bearing on the claims adjudication process. Blake's assertions regarding the submitter field data (which defendants including Fletcher and Jim Porter adopted) has turned out to be inaccurate.

claim. There is no "scrubbing" or "altering" or "falsifying" of data in the nefarious sense implied by the defendants. That is simply how the process works.

When Florida Blue receives the claim from Availity, all the information associated with the claim enters a data warehouse program. A validation edits process begins, which is designed to mostly check Availity's work. This process determines if the claim is for a Florida Blue member, if a valid provider is listed on the claim (one that has a contract with Florida Blue - CGH in this instance), and if the information on the claim is otherwise accurate and complete such that the claim can proceed to the next phase, which is known as a procedure diagnosis.

The procedure diagnosis phase is where the claim is adjudicated. This involves an analysis of member benefits, medical policy edits, and benefit edits. In this phase, the covered member is identified, the type of coverage that the member has with Florida Blue is determined, revenue codes are assessed, and then a coverage determination is made for a listed procedure or test (in this instance a laboratory test) based on the nature of the member's Florida Blue product. This phase also ensures that claims were timely submitted, the co-payment amount, and the location of the service. Florida Blue follows this procedure for the over 70 million claims it adjudicates each year.

When the government issued the grand jury and trial subpoenas for claims data, the government asked for laboratory claims for a specific provider (*e.g.*, CGH), during a specific time period, and for a specific type of claim (laboratory testing).

CGH is identified in the Florida Blue data by its name, NPI, and TIN. This is a representation that CGH provided the service.

When Florida Blue received the subpoena with parameters for the claims data for CGH, employees familiar with the data warehouse system extracted data on the claim as it appeared when Florida Blue received it, and certain other information that was not on the claim. The information not on the claim includes information self-generated by Florida Blue for its own purposes, for example, the paid amount, allowed amount, total deductible, total co-insurance, and the co-pay amount. In other words, the claims data spreadsheet is a business record that Florida Blue keeps in the ordinary course of business, which is fashioned from claims data that ultimately shows the entire story of the claim and the adjudication result from the claim submission. The maintenance of the underlying claims data in an electronic database is a regular business practice of Florida Blue, as is the creation of these spreadsheets when certain claims information is requested or when Florida Blue otherwise wishes to analyze a specific claims data set. The information on the spreadsheets is derived from the claims data in the data warehouse, which includes the claim adjudication information and the payment information not originally on the claim, all of which is stored at the time the claim adjudication decision is made.

Without the claims data spreadsheet (which involves over 100 columns of information) and tens of thousands of entries, there is no way to present the claims data and adjudication results in an understandable fashion. Florida Blue cannot, as a practical matter, turn over its entire data warehouse to the government, for the

government to provide to the defendants. The insurer witnesses will satisfy the Rule 803(6) foundation, such that the Court can make the phase one Rule 104(b) determination and admit the business records for the jury to make the ultimate authenticity determination. A separate hearing, much less months before the trial, to authenticate a business record is unnecessary.

### 2. Type of Bill code "141" and Place of Service code "22"

Fletcher and Durall argue that the inclusion of the Place of Service code "22" on the insurers' claims data spreadsheets, when that information was not submitted by the hospitals, demonstrates that the spreadsheets contain "altered" or "false" information, and therefore are irrelevant or inauthentic. The defendants' argument reflects a failure to understand how the "22" code is generated.

To address the "22" code, it is necessary first to address the "Type of Bill" code. The electronic claims submissions in this case contain a "Type of Bill Code" that lists 141. This "Bill Type" column is column "N" in the CGH claims data spreadsheet. Each digit in this code has a meaning defined by the Centers for Medicare and Medicaid Services (CMS). The first digit refers to the type of facility where the service was provided – "1" means hospital. The second digit "4" means non-patient. The third digit "1" is not relevant for present purposes. CMS has defined that a type of bill "141" is used for a non-patient laboratory specimen, and a non-patient is "a beneficiary that is neither an inpatient nor an outpatient of a hospital, but that has a specimen that is submitted for analysis to a hospital and the beneficiary is not physically present." *See* https://www.cms.gov/Regulations-and-

Guidance/Guidance/Transmittals/downloads/R795CP.PDF, at 6. Thus, the 141 code means that the non-patient specimen **was submitted to a hospital** for testing. The technical report describing the 837I says the same thing. The "1" as the first digit means the services were performed **at a hospital**. This 837I information passes unchanged through the claims adjudication process to the insurer.

      The nature of the facility claim (listing CGH as the provider in this instance) and the inclusion of the 141 code triggers the insurance company to designate the Place of Service (Colum AX in the CGH claims data spreadsheet) as "22". As set forth in the Government's Response to Durall's Renewed Motion for Bill of Particulars (Doc. 477), this is also a CMS-defined code. "22" means "on campus-outpatient hospital," that is, "[a] portion of a hospital's main campus which provides diagnostic, therapeutic (both surgical and nonsurgical), and rehabilitation services to sick or injured persons who do not require hospitalization or institutionalization." *See* https://www.cms.gov/Medicare/Coding/place-of-service-codes/Place_of_Service_Set. Neither the UB-04 nor the 837I has a place for a hospital submitting a claim to insert the "22" code. In other words, the government agrees that the defendants did not submit the "22" code; rather, the "22" code is self-generated by the insurer based on the hospital's submission of the "141" code. The "22" code on the claims spreadsheets hardly renders the spreadsheets inauthentic or irrelevant. It represents the insurer confirming the information on the claim and telling itself that "the place of service for this claim is a location at the hospital." The reason insurers generate this code is because the location of the service has relevance

to the reimbursement that will be paid. Thus, when the insurer pulls claims data from its warehouse and presents it in a readable spreadsheet, the Place of Service column shows the "22" code. This simply shows the physical location where the service was provided. This internal coding is not nefarious and does nothing to "alter" or "scrub" the claim. The adjudication information on the claim is not changed.

The scheme alleged here is that the defendants engaged in a conspiracy to defraud the insurance companies by representing that the testing of the urine sample itself (provided by the patient) had some connection to the hospital, when it did not, and omitting any mention of the independent lab where testing took place.[3] The hospitals were unable to perform the overwhelming amount of the testing listed in the claims. The four rural hospitals could perform limited point of care testing (known as qualitative testing). The independent labs performed the more expensive quantitative (or confirmatory) testing, yet the defendants fraudulently billed the insurance companies as if the small rural hospitals with the high reimbursement rates were the providers that performed the testing.[4]

---

[3] There is no dispute that the patients themselves had no connection to the hospital. The parties agree that the patients never went to the rural hospitals.

[4] Had the independent labs wished to properly represent that they were the service provider of the qualitative point of care, or the quantitative (confirmatory) testing, they would have billed professional claims on CMS-1500 claim forms (or submitted the electronic equivalent). During the trial, the government will seek admission of claims data spreadsheets that show the dearth of reimbursements that all three independent labs received from the insurers when lab claims were billed in this manner identifying the independent lab as the provider. These claims data spreadsheets are compiled in the same manner as the claims data spreadsheets containing claims submitted by the small rural hospitals as the provider. There was likewise no effort by the insurance companies to alter, change, or scrub material information from these claims or the spreadsheets.

### C. Claims Data Spreadsheets Are Not Rule 1006 Summary Charts

Fletcher and Durall's contention that the claims data spreadsheets are Rule 1006 summary charts is incorrect. The claims data spreadsheets are voluminous records that satisfy the Rule 803(6) hearsay exception of Records of a Regularly Conducted Activity. The defendants are one position off. The claims data spreadsheets are the voluminous writing. From the spreadsheets, the government intends to prepare various summary charts to illustrate their content pursuant to Rule 1006. This process in a health care fraud trial is illustrated in *United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020).

In *Melgen*, the defendant objected to the admission of Rule 1006 summary charts that summarized certain aspects of voluminous Medicare claims. 967 F.3d at 1260. The government sought admission of Rule 1006 summary charts in this fraud trial to show that Melgen's practices were markedly different from similarly situated physicians, thus this was a comparison from multiple different claims data sets. *Id.* at 1257. The Eleventh Circuit held that when underlying evidence is made up of voluminous claims, the district court has good reason to use Rule 1006 for the admission of summary charts, thus the district court did not abuse its discretion. *Id.* at 1260. Further, the admission of the summary charts did not implicate the Confrontation Clause because the summaries were drawn from non-testimonial Medicare records. *Id.* at 1261.

The defendants attempt to categorize the claims data spreadsheets as Rule 1006 summary charts. They are not. The summary charts the government intends to

13

present will be derived from the claims data spreadsheets. For example, these charts will show the drastic difference in claims paid when the small rural hospitals are listed as the provider, as opposed to when the independent labs are listed as the provider. This difference is enormous and will illustrate why these defendants sought out and assumed control of these small rural hospitals, that is, to materially misrepresent to the insurance companies that the small rural hospitals performed the testing to take advantage of the in-network contracts with insurance companies with high reimbursement rates. Thus, as in *Melgen*, the actual summary charts are derived from the voluminous claims data sets. If the defendants had their way (and the claims data spreadsheets were excluded), there would be no meaningful way to present the claims data and adjudication information to the jury. The government can properly authenticate the claims data spreadsheets with witness testimony from insurance company witnesses. This is routinely done in healthcare fraud cases throughout the country without the need for a Rule 104 hearing prior to trial.

D.   **Conclusion**

The Court should deny Defendants Christian Fletcher and Aaron Durall's Motions for a Rule 104 Hearing and to exclude the claims data spreadsheets. The premise for the motions (that the insurance companies somehow nefariously altered claims data information) was seemingly created by the defendants to confuse and obfuscate the issue for the Court as to what the claims data spreadsheets show and how the spreadsheets reflect the claims adjudication process. The Court should deny these motions.

        Respectfully submitted,

        KARIN HOPPMANN
        Acting United States Attorney

By:  */s/ Tysen Duva*
       TYSEN DUVA
       Assistant United States Attorney
       Florida Bar No. 0603511
       300 N. Hogan Street, Suite 700
       Jacksonville, Florida 32202
       Telephone:  (904) 301-6300
       Facsimile:   (904) 301-6310
       E-mail:  Tysen.Duva@usdoj.gov


       JOSEPH S. BEEMSTERBOER
       ACTING CHIEF
       U.S. DEPARTMENT OF JUSTICE
       CRIMINAL DIVISION, FRAUD SECTION

By:  */s/ Gary A. Winters*
       JAMES V. HAYES
       Senior Litigation Counsel
       GARY A. WINTERS
       Trial Attorney
       United States Department of Justice
       Criminal Division, Fraud Section
       1400 New York Avenue, NW
       Washington, DC 20005
       Tel: (202) 598-2382
       Email:  Gary.Winters@usdoj.gov
                James.Hayes@usdoj.gov

## CERTIFICATE OF SERVICE

I, hereby certify that, on December 15, 2021, a true and correct copy of the foregoing was filed and served on all counsel via the CM/ECF system.

                                          */s/ Tysen Duva*
                                          Tysen Duva
                                          Assistant United States Attorney