## PARTICIPATING HOSPITAL AGREEMENT

This Participating Hospital Agreement (this "Agreement") is entered into between RightCHOICE Managed Care, Inc. ("RightCHOICE"), and Putnam County Memorial Hospital, a(n) a Public Corporation ("Hospital").

### RECITALS:

A. Hospital desires to provide certain health care services to individuals in programs offered by or available from or through RightCHOICE and its affiliates, and Hospital desires to participate in such programs as a "Participating Hospital," all as hereinafter set forth.

B. RightCHOICE desires for Hospital to provide such health care services to individuals in such programs, and RightCHOICE desires to have Hospital participate in certain of such programs as a "Participating Hospital," all as hereinafter set forth.

### AGREEMENT:

NOW, THEREFORE, in consideration of the promises and of the mutual covenants herein, it is agreed as follows:

### ARTICLE I - DEFINITIONS

When appearing with an initial capital letter in this Agreement, the following capitalized and bolded terms have the meanings set forth below in this Article I.

1.0 **ALLIANCE PROGRAM** means the Preferred Provider Program that provides incentives to Covered Persons in such program to utilize the services of certain contracted providers who are designated as "participating providers" in such program. The Alliance Program includes those Coverage Agreements established, marketed, administered or sponsored by a Company as preferred provider alternatives or which use the "Alliance" network of participating providers, including, without limitation, the **Blue Access PPO Program**, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.1 **ALLIANCECHOICE PROGRAM** means the Preferred Provider Program that provides incentives to Covered Persons in such program to utilize the services of certain contracted providers who are designated as "participating providers" in such program. The AllianceCHOICE Program includes those Coverage Agreements established, marketed, administered or sponsored by a Company as preferred provider alternatives or which use the "AllianceCHOICE" network of participating providers, including, without limitation, the **Blue Access Choice PPO Program**, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.2 **ALLIANCEPREFERRED PROGRAM** means the Preferred Provider Program that provides incentives to Covered Persons in such program to utilize the services of certain contracted providers who are designated as "participating providers" in such program. The AlliancePreferred Program includes those Coverage Agreements established, marketed, administered or sponsored by a Company as preferred provider alternatives or which use the "AlliancePreferred" network of participating providers, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.3 **ALLOWED AMOUNT** means the maximum reimbursement for the provision of Covered Services to Covered Persons; such amounts are determined by a Company in accordance with Article IV hereof and neither a Company, Covered Persons nor any other person are responsible for any amount above the Allowed Amount.

1.4 **COMPANY** means (collectively or individually, as appropriate in the context) RightCHOICE, its affiliates, and its subsidiaries, including, without limitation, Healthy Alliance Life Insurance Company ("HALIC"), HMO Missouri, Inc. ("HMO Missouri") and RightCHOICE Insurance Company, except those excluded by RightCHOICE.

1.5 **COMPANY PROGRAM** means any program now or hereafter established, marketed, administered or sponsored by a Company (and includes the Coverage Agreements that access, or are issued or entered into in connection with such program), except those excluded by RightCHOICE. The current Company Programs include, but are not

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000002

DOJCGH_0001030840

limited to, the Alliance Program, AllianceCHOICE Program, AlliancePreferred Program, HMO Program, Income-Based Program and Regular Program.

1.6 **COVERAGE AGREEMENT** means any agreement, contract, program or certificate entered into, issued or agreed to by a Company, a plan sponsor, or a group, under which a Company furnishes administrative services or other services in support of a health care program, and which may include access to one or more of the Company's provider networks or vendor arrangements, except those excluded by RightCHOICE. Coverage Agreement also includes any agreement between a Company or any other Blue Cross or Blue Shield plan, or the Blue Cross and Blue Shield Association entitling a Covered Person to receive benefits for Covered Services.

1.7 **COVERED PERSON** means any individual entitled to receive Covered Services pursuant to the terms of a Coverage Agreement.

1.8 **COVERED SERVICES** means those health services, products, accommodations and care for which a Company determines that benefits are available under the applicable Coverage Agreement. Covered Services may or may not be "Payable Services" depending on whether the services are considered Medically Necessary or whether medical necessity is required for the particular service to be payable under the applicable Coverage Agreement.

1.9 **ESTABLISHED CHARGES** means the schedule of reasonable and customary charges for services and supplies provided by Hospital.

1.10 **HMO PROGRAM** means those health maintenance organization programs offered by a Company that arrange for the delivery of health care services to Covered Persons in such programs. The HMO Program includes those Coverage Agreements established, marketed, administered or sponsored by or through a licensed health maintenance organization or which use the "HMO" network of participating providers, including, without limitation, the **Blue Preferred HMO Program and the Blue Preferred Plus POS Program**, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.11 **HOSPITAL SERVICES** means those inpatient and outpatient services, products, accommodations and care that are customarily provided or available at or available from Hospital.

1.12 **INCOME-BASED PROGRAM** means the low income-based eligibility Preferred Provider Program that provides incentives to Covered Persons in such program to utilize the services of certain contracted providers who are designated as "participating providers" in such program. The Income-Based Program includes those low income-based eligibility Coverage Agreements established, marketed, administered or sponsored by a Company or which use the "income-based" network of participating providers, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.13 **MEDICALLY NECESSARY** means a determination, through Utilization Management, audit or normal claims adjudication processes or under the terms of the applicable Coverage Agreement, including and subject to the grievance and appeal processes available under such Coverage Agreement, that Covered Services are: (a) appropriate and necessary for the symptoms, diagnosis or treatment of the medical condition, (b) provided for the diagnosis, care and treatment of the medical condition, (c) within standards of good medical practice within the medical community, (d) not primarily for the convenience of the Covered Person, the attending physician or another health care provider, and (e) the type, supply or level of service or care which can safely be provided and that is not more than what is necessary or appropriate.

1.14 **OTHER PAYOR** means a client of a Company who bears direct financial responsibility for paying from its own funds, without reimbursement from the Company, the cost of Covered Services rendered to Covered Persons under a Coverage Agreement, and who contracts, directly or indirectly, with the Company for certain services with respect to such Coverage Agreement.

1.15 **PARTICIPATING HOSPITAL** means, with respect to a particular Company Program, a hospital that has, directly or indirectly, contracted with the Company and which is designated as a "participating provider" in such Company Program, and includes Hospital with respect to those Company Programs identified on the signature page of

FOIA CONFIDENTIAL TREATMENT REQUESTED     RCMC0000003
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

DOJCGH_0001030841

this Agreement and such other Company Programs designated from time to time as hereinafter provided in this Agreement.

1.16   **PARTICIPATING PROVIDER** means, with respect to a particular Company Program, each hospital, physician, professional, ancillary or other health care provider that has, directly or indirectly, contracted with a Company to provide Covered Services to Covered Persons and that is designated by the Company as a "participating provider" in such Company Program, and includes Hospital with respect to those Company Programs identified on the signature page of this Agreement and such other Company Programs designated from time to time as hereinafter provided in this Agreement.

1.17   **PAYABLE CHARGES** means the Established Charges for Payable Services. Payable Charges will not necessarily be paid either in full or in part, but will be paid as provided in this Agreement. The Payor's payment, if any, will be as prescribed in this Agreement.

1.18   **PAYABLE SERVICES** means those Covered Services for which benefits are payable and which are determined by a Company to be Medically Necessary or for which medical necessity is not a requirement under the applicable Coverage Agreement.

1.19   **PAYOR** means an Other Payor or a Company; provided, however, that a Company is a "Payor" only with respect to those Coverage Agreements for which the Company bears direct financial responsibility for paying from its own funds, without reimbursement from an Other Payor, the cost of Covered Services rendered to Covered Persons under the Coverage Agreement.

1.20   **PREFERRED PROVIDER PROGRAM** means those programs offered by a Company that provide incentives to Covered Persons to utilize the services of certain contracted providers. The Preferred Provider Program includes those Coverage Agreements established, marketed, administered or sponsored by a Company, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE. The current Preferred Provider Programs include the Alliance Program, AllianceCHOICE Program, AlliancePreferred Program and Income-Based Program.

1.21   **PROSPECTIVE PAYMENT SCHEDULE** means at any given time the then effective schedule(s) of maximum rates applicable to a particular Company Program under which Hospital will be compensated for the provision of Covered Services to Covered Persons.

1.22   **REGULAR PROGRAM** means those programs that do not provide financial incentives in the form of provider benefit differentials to Covered Persons to utilize the services of contracted providers, but which may provide administrative incentives to Covered Persons (e.g., claim submission by, and direct payment to, providers). The Regular Program (or also sometimes referred to as the Traditional Program) includes those Coverage Agreements established, marketed, administered or sponsored by a Company, whether or not underwritten or administered by a Company, except those excluded by RightCHOICE.

1.23   **UTILIZATION MANAGEMENT** means and refers to a function, performed by a Company, its delegate, a plan sponsor or a group, to determine whether certain health services, products, accommodations and care provided, or to be provided, are Medically Necessary and of acceptable quality. Utilization Management may include, but is not limited to, the following services: precertification, concurrent review, voluntary second opinion program, disease management, discharge planning, case management. Utilization Management determinations include, but are not limited to, whether prescribed equipment, length of need, or plan of treatment are necessary and appropriate for a Covered Person's medical condition, and whether the services or equipment prescribed is appropriate and has been provided in the most appropriate setting.

### ARTICLE II - HOSPITAL SERVICES AND COMPANY PROGRAMS

2.0   Hospital. Hospital shall comply with and abide by the terms and conditions of this Agreement, and fulfill the obligations imposed on Hospital under this Agreement. During the term of this Agreement and so long as Hospital is a "Participating Hospital" under this Agreement, Hospital shall participate in the Company Programs under and pursuant to this Agreement only.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000004

DOJCGH_0001030842

2.1 <u>Treatment of Covered Persons</u>. Hospital shall provide Hospital Services to Covered Persons in accordance with and subject to the terms and conditions of this Agreement. Hospital shall continue to provide to Covered Persons those Hospital Services presently provided by the Hospital to individuals without separate charge. Hospital shall provide Hospital Services to each Covered Person within the same scope and manner as such services are provided to Hospital's other patients. Hospital shall provide Hospital Services to each Covered Person in a nondiscriminatory manner without regard to the Covered Person's race, ethnic or national origin, color, sex, age, marital status, sexual preference, religion, health status, disability, source of payment or status as a private insured or participant in a publicly financed or other program. Subject to the other provisions of this Agreement, Hospital shall treat Covered Persons as referred, prescribed, and authorized by the prescribing physician. Hospital shall make emergency services available to Covered Persons twenty-four (24) hours a day, seven (7) days per week.

2.2 <u>Records</u>.

(a) Hospital shall prepare and maintain medical records for Hospital Services provided to Covered Persons in such form and detail as are required by applicable state and federal laws and consistent with generally accepted medical standards. Hospital shall retain all books and records at its principal place of business in the State of Missouri (or such other site approved by a Company) and shall provide access to such books, records and information for a minimum period of five (5) years following the provision of Covered Services to Covered Persons or such longer period of time as may be required by state or federal law applicable to the particular Coverage Agreement or Covered Person.

(b) When appropriate and subject to applicable law, Hospital shall (i) provide a Covered Person with access to, and copies of, his or her medical records upon the request of such Covered Person; and (ii) permit a Covered Person to submit additional relevant information to be included in his or her medical record; any such additional information will be included with the medical record each time the medical record is disclosed or transferred. When requested by a Covered Person, representative of a Covered Person or a Company, Hospital shall provide the requesting person with information regarding Hospital's licenses, credentials, and privileges, including information regarding all disciplinary and other adverse actions taken with respect to Hospital's licenses, credentials or privileges, and such other information as may be required by applicable laws and regulations.

(c) Upon the request of a Company, any state or federal governmental authority that has jurisdiction or authority over a Company, or any other organization which certifies, accredits or licenses a Company or from whom a Company is seeking certification, accreditation or licensure, Hospital shall permit such persons or their representatives to conduct site visits, audits and inspect the books, records and information of Hospital relating to the provision of Hospital Services to Covered Persons. Such access and inspection shall be provided by Hospital in a manner reasonably acceptable to the Company. Upon a Company's reasonable request, Hospital shall provide copies of such books, records and information without charge to the Company or its Covered Persons.

(d) Upon a Company's reasonable request from time to time, Hospital shall certify, in writing, whether it is financially capable and has the legal authority and clinical capability to furnish Hospital Services to Covered Persons and shall provide reasonable evidence to support such certification to the Company. Hospital shall provide, along with the certification, such additional information as may be required by any state or federal law, regulatory authority, or organization that certifies, accredits or licenses the Company or from whom the Company is seeking certification, accreditation or licensure.

(e) Each party shall establish and implement policies and procedures designed to protect the confidentiality of patient health information, including mental health information. Upon request, Hospital shall provide a Company with a copy of such policies and procedures established and implemented by Hospital.

(f) The provisions of Sections 2.2(a), 2.2(b) and 2.2(c) survive the termination of this Agreement.

2.3 <u>Control of Care</u>. Nothing in this Agreement interferes, or is to be construed to interfere, with Hospital's control of care and the delivery of services related to and supporting the treatment and medical care provided to a Covered Person, and the nature and scope of Hospital Services provided by Hospital from time to time to its patients, including Covered Persons. Hospital is solely responsible for the treatment and care provided to a Covered Person and the delivery of services related to and supporting the treatment and medical care provided to a Covered Person.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000005

DOJCGH_0001030843

2.4     Use of Name. Hospital hereby authorizes each Company to use Hospital's name, telephone numbers, addresses, specialties, certifications, hospital affiliations, if any, and other descriptive characteristics of Hospital's facilities, practices and services for the purpose of identifying Hospital as a "Participating Hospital" in the applicable Company Programs. Hospital may not use the registered trademark or service mark of a Company without the prior written consent of the Company. Hospital may only use the name of a Company for purposes of identifying Hospital as a Participating Hospital in the Company Programs in which it participates.

2.5     Company Programs and Provider Panels. Subject to the other provisions of this Agreement, a Company may identify Hospital as a "Participating Hospital" in each Company Program designated on the signature page of this Agreement. A Company may also identify Hospital as a "Participating Hospital" in additional Company Programs designated, in writing, from time to time by the Company. The terms and conditions of Hospital's participation as a "Participating Hospital" in such Company Programs shall be on the terms and conditions set forth in this Agreement unless otherwise agreed to, in writing, by Hospital and RightCHOICE. Hospital hereby acknowledges that each Company may have, develop or contract to develop various Company Programs, Coverage Agreements, or provider networks that have a variety of provider panels, program components and other requirements. A Company cannot and does not warrant or guarantee: (a) that Hospital will participate in all or a minimum number of provider panels, (b) that Hospital will be utilized by a minimum number of Covered Persons, or (c) that Hospital will indefinitely remain a Participating Hospital or member of the provider panel for a particular network, Company Program, or Coverage Agreement.

2.6     Company Policies, Programs and Procedures. Hospital shall participate in, comply with, and provide Hospital Services in accordance with the policies, programs and procedures established and implemented by a Company for the various Company Programs and Coverage Agreements, including but not limited to, the special services arrangements, the grievance and dispute resolution/appeals procedures, pre-admission and authorization requirements, the provider manual, and the utilization management and quality improvement programs described below in Article III. Upon Hospital's reasonable request, the Company shall provide Hospital with a copy of the applicable provider manual that describes such policies, programs and procedures, as well as the criteria used to evaluate performance and information regarding Covered Persons' liability under certain Company Programs, such as the HMO Programs. In the event the Company makes a material change to such provider manual, the Company will use reasonable efforts to notify Hospital, in advance, of such change. Such notice may be given by the Company through its periodic provider newsletter, an update to the provider manual, or any other written method.

2.7     Licensing and Compliance.

(a)     At all times during the term of this Agreement, Hospital and its agents and employees shall be and remain licensed and certified (including Medicare certification) in accordance with all state and federal laws and regulations (including those applicable to utilization review and claims payment), and shall comply with and abide by all state, federal and local laws and regulations relating to the provision of Hospital Services to Covered Persons. Hospital shall supply evidence of such licensure, compliance and certifications to the Company upon request. Notwithstanding any provision in this Agreement to the contrary and, with respect to Participating Physicians who are doctors of medicine or doctors of osteopathy, the terms and conditions set forth in the Multi-District Litigation Settlement Agreement Addendum to the RightCHOICE Managed Care, Inc. Participating Hospital Agreement shall control and are incorporated into this Agreement as Exhibit B.

(b)     Hospital hereby acknowledges that it has been informed that a Company is or may be a contractor or subcontractor with respect to the Federal Employees Health Benefits Program ("FEP Program") and, as such, the Company is or will be subject to federal laws and other requirements that are applicable to persons providing services and items in connection with the FEP Program. At all times during the term of this Agreement, Hospital and its agents, employees, representatives, and subcontractors shall comply with and abide by the following: (i) all obligations and requirements imposed on Company or its subcontractors (and, if applicable, providers) under the Company's contract(s) for the FEP Program that apply or relate to the provision of any service or item, or the performance of any activity, by Hospital; and (ii) all state and federal laws, regulations and rules, including any rules or other requirements promulgated or adopted for the FEP Program applicable to the Company or its subcontractors (and, if applicable, providers) that apply or relate to the provision of any service or item, or the performance of any activity, by Hospital; all of such obligations, requirements, laws, regulations and rules are incorporated herein by this reference and are deemed to be set forth in full

FOIA CONFIDENTIAL TREATMENT REQUESTED     RCMC0000006
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

DOJCGH_0001030844

herein. Upon Hospital's reasonable written request from time to time, the Company will provide Hospital with a list of the requirements that may or could be applicable to Hospital under the Company's contract(s) for the FEP Program.

2.8   Referral and Transfer. When required by a Company or the Coverage Agreement, Covered Persons must have appropriate referral forms prescribed by the Company. Hospital shall refer or transfer the Covered Person to another Participating Provider except in cases of emergency or when specific expertise is not available within the provider panel of a Company Program as determined by the Company's medical director in consultation with Hospital and the Company's medical director approves the referral or transfer to a non-Participating Provider. When referral or transfer of a Covered Person to a non-Participating Provider is necessary, Hospital shall coordinate such referrals or transfers with the Company's medical director or medical management department, except in cases of emergency as defined in the applicable Coverage Agreement. Hospital shall utilize the special service arrangements established by a Company from time to time with applicable Participating Providers for those Covered Services designated by the Company from time to time for a particular Company Program. Nothing in this Agreement prohibits or is to be construed to prohibit, Hospital from transferring, referring or providing Hospital Services to a Covered Person on such terms as Hospital and the Covered Person may agree. However, failure to comply with the Company's or the applicable Coverage Agreement's approvals, certifications, authorizations and other requirements could result in a denial or reduction of payment to Hospital or in a denial or reduction of the Covered Person's benefits. The approvals, authorizations, certifications and other requirements of the Company or the Coverage Agreement do not in any way affect or remove the obligation of Hospital to render care.

2.9   Confidentiality. During the term of this Agreement and thereafter, Hospital shall keep confidential the terms and conditions of this Agreement, including all of the related programs and policies of each Company. The preceding sentence does not prohibit or restrict Hospital from disclosing to any Covered Person any information that Hospital deems appropriate regarding: (i) the nature of treatment and the risks or alternatives thereto, (ii) the availability of other therapy, consultation or test, (iii) the decision of the Company to authorize or deny services, or (iv) the process the Company, the Coverage Agreement or any person contracting with the Company uses or proposes to use, to authorize or deny health care services or benefits. The Company does not prohibit or restrict Hospital from advocating in good faith on behalf of Covered Persons as part of: the Utilization Management program, the grievance process established by the Company, a complaint filed against the Company, an appeal of any decision of the Company, an informational or other filing with the Department of Insurance, or a hearing or review under the Company's policies and procedures. This provision survives the termination of this Agreement.

2.10   Independent of Association. Hospital hereby expressly acknowledges its understanding that this Agreement constitutes a contract between Hospital and RightCHOICE, that RightCHOICE, HALIC, HMO Missouri, and certain other Companies ("Licensees") are independent corporations operating under licenses from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans, permitting the Licensees to use Blue Cross and Blue Shield service marks in a portion of the State of Missouri, and that the Licensees are not contracting as agents of the Blue Cross and Blue Shield Association. Hospital further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person, other than RightCHOICE, and that no person, entity, or organization, other than RightCHOICE, shall be held accountable or liable to Hospital for any of RightCHOICE's obligations to Hospital created under this Agreement. This provision does not create any additional obligations whatsoever on the part of RightCHOICE other than those obligations created under other provisions of this Agreement.

2.11   Indemnification. Hospital shall defend, indemnify and hold harmless each Company and all of their respective directors, officers, employees, agents and representatives from and against all claims, liabilities, losses, damages, costs, reasonable attorneys' fees and expenses arising from or relating to, directly or indirectly, (i) any negligent or wrongful act or omission of Hospital or its agents or employees, and (ii) any breach or default of this Agreement by Hospital or its agents or employees. Each Company shall defend, indemnify and hold harmless Hospital and its directors, officers, employees, agents and representatives from and against all claims, liabilities, losses, damages, costs, reasonable attorneys' fees and expenses arising from or relating to, directly or indirectly, (i) any negligent or wrongful act or omission of the Company or its agents or employees, and (ii) any breach or default of this Agreement by the Company or its agents or employees. This provision survives the termination of this Agreement.

2.12   Changes in Coverage Agreement. Hospital hereby acknowledges that the terms, conditions and provisions of the Coverage Agreements, including, but not limited to, Hospital Services that are furnished by Hospital and considered Covered Services under the Coverage Agreements, may be changed from time to time by a Company. The Company shall use reasonable efforts to notify Hospital, in writing, at least thirty (30) days in advance of such changes.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000007

DOJCGH_0001030845

2.13 <u>Eligibility and Coverage Information</u>. For most Covered Persons (other than dependents), the Company will arrange to provide such Covered Persons with an identification card or form. For some Covered Persons, however, an identification card or form may not be issued. With respect to such Covered Persons, the Company shall furnish, or cause to be furnished to Hospital, upon request, such detailed information on the Coverage Agreement as needed for determination of eligibility and Covered Services. The Company will make available to Hospital a method whereby Hospital can obtain, in a timely manner, general information about eligibility and coverage, including information regarding copayments, deductibles, and coinsurance amounts. The Company does not guarantee that persons identified as "Covered Persons" are eligible for benefits or that the services to be provided are "Payable Services." Except as otherwise provided in this Agreement or another applicable agreement or law, Hospital may seek payment directly from any person who is not a "Covered Person" for services provided to that person and may seek payment from a Covered Person for the provision of non-Covered Services.

### ARTICLE III - UTILIZATION MANAGEMENT, QUALITY ASSURANCE AND APPEALS

3.0 <u>Credentialing and Participation</u>.

(a) The Company or its delegate shall credential and recredential Hospital in accordance with the Company's then effective credentialing programs and network management policies. Hospital shall abide by and participate in the Company's credentialing programs and network management policies.

(b) On or prior to the effective date of this Agreement and thereafter upon a Company's request, Hospital shall complete the Company's provider application and shall provide the Company with such additional information as may be required by the Company from time to time. Hospital shall promptly update the information contained in the application upon the occurrence of any event that would render such information untrue or incomplete. Upon the Company's request, Hospital shall also provide the Company with credentialing information on each of its agents and employees.

(c) Notwithstanding anything to the contrary contained in this Agreement, Hospital's participation in a Company Program is contingent upon the Company's approval of its application and Hospital's continued compliance with and fulfillment of the criteria set forth in the Company's quality improvement programs, credentialing programs and network management policies.

3.1 <u>Notice of Changes and Disciplinary Actions</u>. Hospital shall promptly notify RightCHOICE of: (i) any change in Hospital's business address; (ii) the initiation of any proceeding against Hospital to restrict, modify or suspend a license, privileges or authority to participate in any federal or state health program, or the imposition of sanctions resulting from any of the foregoing proceedings; (iii) any other problem or situation that would materially impair the ability of Hospital to carry out the terms and conditions of this Agreement; or (iv) any change in accreditation, hospital affiliations, professional insurance, licensure, certification or eligibility status, or other relevant information regarding Hospital's practice or status in the medical community. Hospital shall report to RightCHOICE all disciplinary actions or other events that may affect Hospital's ability to provide Hospital Services to Covered Persons within fifteen (15) days following the commencement of such action or the date on which Hospital first becomes aware of such action. Hospital also shall provide evidence to RightCHOICE, within the thirty (30) day period after the giving of such notice to RightCHOICE, that a corrective action program has been implemented to remedy the deficiency or reasons for the disciplinary action. RightCHOICE reserves the right to immediately terminate Hospital's participation under this Agreement if such disciplinary action is determined to be of a serious nature, in accordance with the applicable requirements of Section 5.5 hereof.

3.2 <u>Insurance</u>. Hospital, at its sole expense, shall maintain, at all times during the term of this Agreement, insurance for professional liability and comprehensive liability, in amounts reasonably acceptable to RightCHOICE, or a self-insurance arrangement reasonably acceptable to RightCHOICE. Hospital shall provide RightCHOICE with evidence of such insurance upon the effective date of this Agreement and thereafter upon request. Hospital shall advise the Company at least thirty (30) days prior to the termination of such insurance or reduction in the amount of such insurance, or any material change in the self-insurance arrangement. Upon Hospital's reasonable written request, RightCHOICE shall provide Hospital with evidence of its insurance coverage or other self-insurance arrangement maintained by RightCHOICE.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000008

DOJCGH_0001030846

3.3   Utilization Management Program. When applicable to a Coverage Agreement or Company Program, the Company or its delegate shall conduct Utilization Management of Hospital Services provided by Hospital to Covered Persons. Such Utilization Management will be conducted in accordance with the Company's then effective Utilization Management programs applicable to the Coverage Agreement or Company Program, which programs will be generally described in the provider manuals. Hospital shall participate in and abide by the Utilization Management programs applicable to the various Company Programs and Coverage Agreements. Hospital shall be bound by any determination made in accordance with the Utilization Management programs, subject to rights of appeal as set forth below.

3.4   Hospital Services. For Hospital Services which do not meet a Company's participation requirements established for Hospital or the Utilization Management certification, authorization or other requirements, neither Hospital nor anyone acting on behalf of Hospital shall bill or collect (or shall refund any amounts collected) for any nonpayment or payment reduction resulting therefrom, except that Hospital may bill the Covered Person for such Hospital Services when the Covered Person's applicable Coverage Agreement provides that the Covered Person shall be financially responsible to Hospital for any such nonpayment or payment reduction unless another agreement prohibits Hospital from billing or collecting for such nonpayment or payment reduction.

3.5   Quality Improvement Programs and Grievance Procedures. Each Company or its delegate shall administer the grievance procedures and quality improvement programs applicable to the Company Programs and Coverage Agreements, which procedures and programs will be generally described in the provider manuals. Hospital shall comply with and participate in such grievance procedures and quality improvement programs established for the various Company Programs and Coverage Agreements and shall comply with the decisions resulting from such procedures and programs. Hospital also shall implement its own active quality improvement program. Upon the Company's request, Hospital shall furnish the Company with a copy of its written quality improvement program and evidence that the program is being carried out, including, but not limited to patient and physician satisfaction surveys and quality of care evaluations.

3.6   Studies. Hospital shall participate in a Company's utilization, outcome and other management studies and programs, and shall share with and report data to the Company which is necessary for such studies and programs. Hospital agrees that each Company may use such data and information derived from such studies and programs for purposes of comparative analysis, cost containment and quality improvement efforts, a Company's licensing, certification and accreditation requirements and compliance with state and federal laws and regulations. Hospital hereby authorizes each Company to disclose such information and data to the extent necessary or appropriate for such purposes. Hospital shall provide to each Company, at no cost and in the time and manner reasonably prescribed by the Company, the information and reports required, if any, by various national and other certification and accreditation committees, commissions, agencies, or entities. Such reports and information will be provided in accordance with the standards established by such entities. This provision survives the termination of this Agreement.

3.7   Release. Hospital shall obtain and maintain a written authorization from each Covered Person treated by Hospital, pursuant to which the Covered Person authorizes Hospital and the Company to obtain, release and use medical information regarding the Covered Person and the care and treatment provided to the Covered Person in connection with the services and responsibilities of each party under this Agreement or any Company Program. Hospital shall provide to the Company, upon request, a copy of the Covered Person's release. Hospital acknowledges and agrees that each Company may use and disclose information and data obtained from or about Hospital, including this Agreement, to the extent determined reasonably necessary or appropriate by a Company, including, but not limited to, any disclosure by a Company in connection with its efforts to maintain and improve quality assurance, manage utilization and costs, process and pay claims, administer the Company Programs, and comply with accreditation and certification requirements, state and federal laws and regulations, and requests and requirements of regulatory, governmental, accreditation and certification authorities and organizations. This provision survives the termination of this Agreement.

3.8   Dispute Resolution/Appeals. Hospital may appeal any determination made by a Company as part of the Utilization Management program, payment process or any other matter under this Agreement. If Hospital objects to or disagrees with any determination, Hospital must timely file an appeal of such determination. The request for appeal must be submitted, in writing, to the Company in accordance with and as described in the Utilization Management program guidelines or other applicable policies of the Company regarding dispute resolution/appeals. Any such dispute

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000009

DOJCGH_0001030847

resolution/appeal process will comply with applicable laws, if any. Hospital agrees to be bound by all final decisions made in accordance with such programs and policies, subject to the rights and obligations set forth in Section 6.14 hereof.

## ARTICLE IV - CLAIMS SUBMISSION AND PAYMENT

4.0 <u>Compensation, In General</u>. Subject to the terms and conditions of this Agreement, Hospital will be compensated for the provision of Covered Services to Covered Persons pursuant to this Article IV and the other provisions of this Agreement. Hospital shall accept the compensation provided for in this Agreement as payment in full for the provision of Covered Services to Covered Persons. Neither Hospital nor anyone acting on behalf of Hospital shall bill, collect or attempt to collect any amounts in excess of the Allowed Amount set forth in this Agreement for the provision of Covered Services to Covered Persons.

4.1 <u>Submission of Claims</u>.

(a) Hospital shall submit to the Company or its delegate each claim for payment for Hospital Services provided to a Covered Person within the one hundred eighty (180) day period following: (i) the date of discharge or transfer for an inpatient admission, or (ii) the date of service for any other service. Hospital shall not bill or seek payment from a Payor, a Covered Person or any other person for Covered Services not contained on a claim submitted to the Company or its delegate within such one hundred eighty (180) day period. Hospital shall submit claims electronically to the Company and shall submit at least ninety percent (90%) of the Company's claims electronically.

(b) Hospital shall include its Established Charges on each claim submitted by, or on behalf of, Hospital. Hospital shall bill only for Hospital Services performed by, or under the direction and personal supervision of Hospital. Hospital is responsible for each claim submitted by, or on behalf of, the Hospital. Hospital shall use its best efforts to submit only one claim for each admission of a Covered Person (including ambulatory procedures, charges on the day of admission, and preadmission testing) and only after all charges and credits have been recorded on the claim. All charges by any other hospital or facility for specific care or treatment when transported to such other hospital or facility because care or services were not available at Hospital will be deducted from amounts otherwise due hereunder to Hospital. Hospital shall not bill portions of a claim whether on a cycle billing basis or split over the end of a fiscal year. Hospital waives and releases all rights to bill and collect for Covered Services not included in the initial claim as submitted.

(c) In addition, Hospital shall submit encounter data to the Company for Covered Services provided to a Covered Person. Hospital shall submit such encounter data in a manner and format, and within the time frames, reasonably required by the Company.

(d) By executing this Agreement, Hospital hereby certifies that all claims information, encounter data and other information submitted by or on behalf of Hospital to a Company will be and are accurate, complete, and truthful. Upon a Company's request from time to time, Hospital shall execute and deliver to the Company a written certification to that effect, in a manner, format, and within the timeframe reasonably required by the Company. Hospital hereby acknowledges that the Company will rely on such information and certification when the Company prepares and submits its data, reports, notices and filings to state and federal regulatory entities and other applicable persons and entities.

4.2 <u>Claims Information</u>. Hospital shall utilize the appropriate revenue and alpha-numeric procedure codes as specified by a Company on all claims and encounter data submitted by, or on behalf of Hospital. Hospital also shall provide valid and appropriate billing and diagnosis codes. In addition, Hospital shall comply with the Company's claims submission, processing and adjudication policies and procedures and shall provide the Company with all documentation reasonably required by the Company regarding Hospital Services provided to Covered Persons. Each claim will be processed and repriced by the Company in a manner consistent with the Company's claims processing and adjudication policies. The Company reserves the right to review all documents and records relative to payment requests submitted by Hospital regarding Hospital Services provided to Covered Persons.

4.3 <u>Encounter Fees</u>. Neither Hospital nor anyone acting on behalf of Hospital shall collect payment from a Covered Person at the time Hospital Services are rendered except for encounter fees (e.g., office visit copayments) as specified in the Covered Person's Coverage Agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000010

DOJCGH_0001030848

4.4 Compensation.

(a) Unless otherwise agreed to by the parties and except as otherwise expressly provided in this Agreement, Hospital's maximum compensation for the provision of Covered Services to Covered Persons will be the Allowed Amount. The "Allowed Amount" is the lesser of (i) the Established Charge, or (ii) the appropriate amount under the applicable Prospective Payment Schedule attached hereto as part of Exhibit A for the Company Program in which the Covered Person participates. The Prospective Payment Schedule for the Regular Program attached hereto as part of Exhibit A applies to all Company Programs for which a specific or separate Prospective Payment Schedule has not been established by the Company. The Allowed Amount is inclusive and covers all Hospital Services provided to a Covered Person. In no event shall a Payor be obligated to compensate or reimburse Hospital for any Hospital Services that do not constitute Payable Services or any amount in excess of the Allowed Amount for Payable Services.

(b) In the event of any overpayment or erroneous payment, Hospital shall refund such payment to RightCHOICE no later than the thirtieth (30th) day following the earlier of the date on which Hospital (or its agents, employees or representatives) first becomes aware of the overpayment or erroneous payment or the date on which Hospital receives a written request from RightCHOICE therefor. In the event Hospital does not refund any such overpayment or erroneous payment on or before the thirtieth (30th) day following receipt of a written request therefor, RightCHOICE may make corrective adjustments to current and future amounts due Hospital. Except as provided below, Hospital and RightCHOICE agree that any payment or payment determination made by or on behalf of a Company that is a "health carrier" ("Health Carrier Company") constitutes full and final satisfaction of any claim for payment submitted by Hospital to or for that Health Carrier Company. If a party fails to challenge, in writing, any payment or payment determination made by or on behalf of a Health Carrier Company within twelve (12) months after such payment or payment determination is made, such payment and/or payment determination shall be deemed a full and final settlement of the claim and shall constitute an accord and satisfaction between and among Hospital, RightCHOICE and the Health Carrier Company with respect to the claim. Nothing in this Section 4.4(b) prevents or precludes such a Company (or anyone acting on its behalf) from pursuing recovery, recovering or making an adjustment for any overpayment (i) that a Company is obligated by law to recover (through the imposition of a duty or otherwise), (ii) that a Company is obligated by duty or contract to recover and for which the Company is not prohibited by law from recovering, (iii) that is made due to any fraud or misrepresentation, or (iv) that is made with respect to a Covered Person with a "health benefit plan" that is not subject to Mo. Rev. Stat. §376.384.1(3) (or any successor thereto) for whatever reason (e.g., by inapplicability, exclusion, preemption, etc.). For purposes of this Section 4.4(b), the terms "health carrier" and "health benefit plan" have the meanings ascribed to such terms in Mo. Rev. Stat. §376.383 (or any successor thereto).

(c) Hospital shall not pay, receive, or offer any incentive, or participate in any incentive program or arrangement, that provides or would provide Hospital or any other physician or provider with a direct or indirect inducement to provide less than Medically Necessary health care services, supplies, accommodations, treatments or care to Covered Persons. Hospital acknowledges and agrees that the Company Programs and the compensation arrangements thereunder do not provide Hospital with an inducement or incentive to provide less than Medically Necessary Physician Services to Covered Persons, and that clinical and treatment decisions will not be influenced by the compensation arrangement. Hospital shall not claim payment in any form, directly or indirectly, from a federal health care program for items or services covered for payment under this Agreement. Each Company and Hospital agree that neither party is giving or receiving any remuneration in return for or to induce the provision or acceptance of business (other than business covered by this Agreement) for which payment may be made in whole or in part by a federal health care program on a fee-for-service basis, and neither the Company nor Hospital shall shift the financial burdens of this Agreement in a manner that increased payments are claimed from a federal health care program.

4.5 Covered Person's Liability. The amount of the Covered Person's liability, if any, under the applicable Coverage Agreement will be deducted from the amounts due Hospital hereunder. Except for encounter fees (e.g., copayments) that may be collected at the time of service, Hospital may bill and collect from the Covered Person, after receiving payment from the Payor, the applicable amount of the Covered Person's liability as determined by the Payor under the applicable Coverage Agreement. Except as set forth in Section 3.4, neither Hospital nor anyone acting on behalf of Hospital shall charge, collect or seek payment from Covered Persons for the provision of Covered Services except for amounts which are the Covered Person's liability, if any, under the applicable Coverage Agreement. Hospital acknowledges and agrees that a Payor is not responsible for payment of the Covered Person's liability under the applicable Coverage Agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000011

DOJCGH_0001030849

4.6     Other Payors. Hospital acknowledges and agrees that the Company has no obligation to compensate or pay Hospital for services (including Payable Services) rendered to Covered Persons of Other Payors, except to the extent the Company may agree with the Other Payor to act as a disbursing agent for funds provided by the Other Payor for such purpose and only to the extent the Company actually receives the required funds.

4.7     Noncovered Services. Except as provided in Section 3.4 hereof or any other provision of this Agreement, including this Section 4.7 (or another agreement to which Hospital is bound), Hospital may charge a Covered Person for services which are not Covered Services under the Covered Person's Coverage Agreement at Established Charges. Investigational care, as defined and determined by Company in accordance with its written policies and procedures and the applicable Coverage Agreement, is not a Covered Service. Hospital shall not bill or collect for investigational care provided to a Covered Person unless the Covered Person requests the investigational care be provided and agrees, in writing, prior to the rendition of the investigational care, to be financially responsible for the provision of such care. In such instances, Hospital may bill and collect its Established Charges from the Covered Person for the provision of such investigational care.

4.8     No Recourse Against Covered Persons. Except as expressly provided in Section 3.4, in no event shall Hospital or anyone acting on behalf of Hospital seek or collect payment or reimbursement for the provision of Covered Services which are determined not to be Medically Necessary. Hospital agrees that in no event, including but not limited to nonpayment by the Payor, insolvency of the Payor, or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Covered Person or any person acting on behalf of the Covered Person, other than a Payor, for services provided pursuant to this Agreement. This Agreement does not prohibit Hospital from collecting coinsurance, deductibles or copayments, as specifically provided in the Coverage Agreement, or fees for non-Covered Services delivered on a fee-for-service basis to Covered Persons. This Agreement does not prohibit Hospital and a Covered Person from agreeing to continue services solely at the expense of the Covered Person, as long as Hospital has clearly informed the Covered Person that the Payor may not cover or continue to cover a specific service or services. Except as provided herein, this Agreement does not prohibit Hospital from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier providing coverage to a Covered Person. In the event of the Payor's insolvency or other cessation of operations, Hospital shall continue to provide Covered Services to Covered Persons of such Payor in accordance with this Agreement until the later of: (i) the expiration of the period through which the premium or membership due has been paid for coverage under the applicable Coverage Agreement, (ii) the date on which the Covered Person is discharged from an inpatient facility, or (iii) the expiration of such other period as may be required by laws or regulations applicable to the Company or the Coverage Agreement. This provision will be construed in favor of a Covered Person and supersedes any oral or written contrary agreement between Hospital and a Covered Person or the representative of a Covered Person if the contrary agreement is inconsistent with this provision or the provisions of this Agreement regarding the continuation of care after termination of this Agreement. This provision survives the termination of this Agreement.

4.9     Other Benefits. Hospital shall assist the Company in coordinating benefits with other payors. When a Payor is the primary payor under the Coverage Agreement, Hospital's compensation will be on the basis specified in this Agreement. If a Payor is other than the primary payor, and Hospital's bill to the primary payor was not computed on the basis specified in this Agreement, any further compensation to Hospital from a Payor or the Covered Person will be determined in accordance with this Agreement, the applicable Coverage Agreement and the Company's written policies and procedures for coordinating benefits. The Company will use reasonable efforts to give Hospital written notice of any material changes in the Company's policies and procedures for coordination of benefits. Such notice may be given by the Company through its periodic provider newsletter, an update to the provider manual, or any other written method. Notwithstanding the foregoing, in no event shall a Payor or the Covered Person be required to pay more than they would have paid had the Payor been the primary payor.

4.10    Established Charges. In no event may an Established Charge for services or supplies rendered or provided to Covered Persons be higher than the Established Charges for the same service or supply when rendered or provided to individuals who are not Covered Persons. Upon the Company's reasonable request from time to time, Hospital shall provide the Company with its then current schedule of Established Charges.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                           RCMC0000012
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

DOJCGH_0001030850

## ARTICLE V - TERM AND TERMINATION

5.0     Term. This Agreement is effective as of the effective date designated by RightCHOICE on the signature page of this Agreement, and will remain in effect for one (1) year unless sooner terminated as provided in this Agreement. Thereafter, this Agreement will automatically renew upon the same terms and conditions then in effect for successive terms of one (1) year each unless this Agreement is sooner terminated as provided in this Agreement or either party gives the other party written notice of non-renewal not less than ninety (90) days prior to the renewal date. In addition, RightCHOICE or Hospital may elect to not renew Hospital's participation as a Participating Hospital in a Company Program, effective as of the renewal date of this Agreement, by giving the other party written notice of such non-renewal not less than ninety (90) days prior to the renewal date of this Agreement.

5.1     Termination Upon Notice. This Agreement or Hospital's participation as a Participating Hospital in a Company Program may be terminated by either party giving the other party at least ninety (90) days prior written notice of such termination.

5.2     Termination With Cause. This Agreement may be terminated by a party giving written notice of termination to the other party if such other party is in breach of or default under any material term or condition of this Agreement and such other party fails to cure the breach or default within the sixty (60) day period immediately following the giving of written notice of such breach or default. Any notice given pursuant to this Section 5.2 must describe the specific breach or default.

5.3     Effect of Termination.

(a)     Hospital shall provide the Company with a list of its patients who are Covered Persons and a list of Covered Persons who are seen on a regular basis within fifteen (15) business days of the date that Hospital either gives or receives notice of suspension, termination or nonrenewal. When required by law or deemed appropriate by the Company, the Company will give, within the time period required by law, if any, notice of such suspension, termination or nonrenewal to Covered Persons seen on a regular basis by Hospital.

(b)     After the effective date of termination of Hospital's participation as a Participating Hospital in a Company Program, this Agreement will remain in effect for purposes of those obligations and rights arising prior to the effective date of such termination. Upon termination of Hospital's participation as a Participating Hospital in a Company Program, Hospital shall (i) continue to provide, as a Participating Hospital, Covered Services to Covered Persons in such Company Program during the longer of the ninety (90) day period following the date of such termination or such other period as may be required by laws, regulations, standards or requirements applicable to a Company or the Coverage Agreement, and, if requested by a Company, Hospital shall continue to provide, as a Participating Hospital, Covered Services to Covered Persons until such Covered Persons are assigned or transferred to another Participating Hospital in such Company Program, and (ii) continue to comply with and abide by all of the terms and conditions of this Agreement applicable to Hospital as a Participating Hospital in such Company Program, including, but not limited to, Section 4.8 hereof, in connection with the provision of such Covered Services during the continuation period. During the continuation period, Hospital will be compensated in accordance with this Agreement as a Participating Hospital for Covered Services rendered to a Covered Person in such Company Program and shall accept such compensation as payment in full. This provision survives the termination of this Agreement.

(c)     After the effective date of termination of this Agreement, this Agreement shall remain in effect for purposes of those obligations and rights arising prior to the effective date of termination. Upon termination of this Agreement, Hospital shall (i) continue to provide Covered Services to Covered Persons during the longer of the ninety (90) day period following the date of termination of this Agreement or such other period as may be required by laws, regulations, standards or requirements applicable to a Company or the Coverage Agreement, and, if requested by a Company, Hospital shall continue to provide, as a Participating Hospital, Covered Services to Covered Persons until such Covered Persons are assigned or transferred to another Participating Hospital, and (ii) continue to comply with and abide by all of the terms and conditions of this Agreement, including, but not limited to, Section 4.8 hereof, in connection with the provision of such Covered Services during such continuation period. During the continuation period, Hospital will be compensated in accordance with this Agreement for Covered Services rendered to a Covered Person after termination of this Agreement and shall accept such compensation as payment in full. This provision survives the termination of this Agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000013

DOJCGH_0001030851

5.4   Suspension of Participation.   Unless expressly prohibited by applicable state or federal law, RightCHOICE has the right to immediately suspend or terminate the participation of Hospital in any or all Company Programs when based upon available information, in the opinion of the Company's medical director, the continued participation of Hospital appears to constitute an immediate and present threat or risk to the health, safety or welfare of Covered Persons. During such suspension, Hospital shall, as directed by RightCHOICE, either discontinue treating Covered Persons or discontinue providing a particular Hospital Service to Covered Persons. During the term of any suspension, the Hospital shall notify Covered Persons that its status as a Participating Provider has been suspended. Such suspension will continue pending full investigation and recommendation by the Company's quality improvement or peer review committee(s).

5.5   Termination Procedures.   When expressly required by applicable law or otherwise deemed appropriate by RightCHOICE, (i) RightCHOICE will include an explanation of the reasons for the proposed termination in any notice of termination given by RightCHOICE, and (ii) if timely requested by Hospital, RightCHOICE will provide Hospital with an opportunity for a review or hearing as required by law and in accordance with RightCHOICE's applicable procedures. For purposes of this Section 5.5 only, a "termination" of this Agreement is different than a "non-renewal" of this Agreement.

### ARTICLE VI - OTHER PROVISIONS

6.0   Notice.   Except as otherwise provided in this Agreement, any notice required or permitted to be given hereunder is deemed to have been given when such written notice has been personally delivered or deposited in the United States mail, postage paid, addressed as follows:

| For the Company send to: | With a copy to: |
|---|---|
| RightCHOICE Managed Care, Inc. | RightCHOICE Managed Care, Inc. |
| 1831 Chestnut St. | 1831 Chestnut St. |
| St. Louis, Missouri 63103 | St. Louis, Missouri 63103 |
| Attention: Vice President, Network Management | Attention: General Counsel |

**For Hospital send to the address indicated on the signature page:**

6.1   Assignment.

(a)   Except as otherwise provided in this Agreement, this Agreement may not be assigned or delegated by a Company without the prior consent of Hospital, which consent shall not be unreasonably withheld or delayed. A Company may freely assign this Agreement, or delegate its duties and responsibilities under this Agreement, in whole or in part, to any successor, subsidiary, affiliate, parent, or any other entity under its control. Hospital may not assign, delegate or transfer this Agreement or the rights or responsibilities provided for herein without the prior written consent of RightCHOICE, which consent shall not be unreasonably withheld or delayed.

(b)   Nothing in this Agreement should be construed to be a delegation or assignment to Hospital of the statutory responsibility of a Company that is a licensed health maintenance organization in Missouri to monitor the offering of Covered Services to Covered Persons.

6.2   Non-Exclusive.   This Agreement does not restrict either party from entering into contracts or arrangements with any other person or entity for the provision of Hospital Services or the payment therefor, or for any other purpose.

6.3   Entire Agreement.   All prior or concurrent agreements, promises, negotiations or representations either oral or written, between the Company and Hospital relating to the subject matter hereof, which are not expressly set forth in this Agreement, are of no force or effect. With respect to the Company Programs covered by this Agreement, this Agreement supersedes any agreement in effect as of the effective date of this Agreement between or among Hospital and

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000014

DOJCGH_0001030852

Company with respect to Hospital's participation in such Company Programs, except with respect to the rates of reimbursement that are applicable to the services furnished by Hospital to Covered Persons prior to such effective date.

6.4     Waiver. Waiver of a breach of any provision of this Agreement may not be deemed a waiver of any other breach of the same or different provision. No act, delay or omission done, suffered, or permitted by a party may be deemed to exhaust or impair any right, remedy or power of that party hereunder.

6.5     Severability. In the event any provision of this Agreement is rendered invalid or unenforceable by any law or regulation adopted by federal or state legislature or promulgated by federal or state officers, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement remain in full force and effect.

6.6     Amendment. Except as otherwise expressly provided in this Agreement, this Agreement or any article, section, exhibit or schedule hereto may be amended at any time during the term of this Agreement only by mutual written agreement of duly authorized representatives of the parties. The Company may unilaterally amend this Agreement or any article, section, exhibit or schedule hereto by giving written notice of such amendment to Hospital to the extent such amendment is deemed necessary or appropriate by the Company in order to comply with, or fulfill the requirements of, state or federal laws or regulations (including, but not limited to, any requirements for the application or fulfillment of any safe harbor under the federal anti-kickback statute (42 U.S.C. §1320a-7b(b)) and any similar state law, any exception under the federal self-referral statute (42 U.S.C. §1395nn) and any similar state law, or any exception, standard, or requirement with respect to the use or disclosure of protected health information under the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations promulgated thereunder) or the standards or requirements of the Company or applicable to a Company or a Coverage Agreement that are established by or for any organization which accredits, certifies or licenses a Company or Coverage Agreement or from whom the Company is seeking accreditation, certification or licensure, any change in such laws, regulations, standards or requirements, or any change in the interpretation of such laws, regulations, standards or requirements. Any such amendment by the Company will be deemed accepted by Hospital upon receipt of such notice.

6.7     Headings. The headings of articles and sections contained in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement.

6.8     Governing Law.

        (a)    Except as hereafter provided, this Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of Missouri. The parties agree that this Agreement evidences a transaction involving interstate commerce.

        (b)    Any legal action or proceeding with respect to this Agreement or any document related hereto, or any action to enforce or challenge an arbitration award, may be brought in the courts of the State of Missouri located in the city or county in which RightCHOICE has its principal executive offices, or any court of the United States of America located in the city or county in which RightCHOICE has its principal executive offices and, by execution and delivery of this Agreement, each party hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of such courts. The parties irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions. Each party irrevocably consents to service of process issued from any such court in any such action or proceeding.

6.9     Independent Entities. Hospital and each Company are independent entities and persons. Nothing in this Agreement may be construed or be deemed to create any relationship other than that of independent parties contracting with each other for the sole purpose of carrying out the provisions of this Agreement. Each individual Company is responsible only for the payment from its own funds of the claims or billings for the provision of Payable Services to Covered Persons of Coverage Agreements underwritten by such Company. A Company is not an insurer, guarantor or underwriter of the responsibility or liability of any other Company or Other Payor. In addition, a Company shall not be responsible or liable for any acts or omissions of any other Company or Other Payor.

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    RCMC0000015
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

DOJCGH_0001030853

6.10   Protection of Proprietary Property. Each element of all works fixed in any tangible medium of expression embodied within or referenced in this Agreement as something created, provided or administered by or for a Company, all trademarks and service marks used in connection with any Company Program (and any component or element thereof or therefor), and all of the Company's business or operational policies, procedures or plans, pricing or reimbursement policies or methodologies, marketing strategies, records, and other Company information of a confidential nature, including without limitation the provisions of this Agreement and the Prospective Payment Schedules, and all derivatives, components, products, systems, methods, formulae, and revisions thereof and related thereto (all of which is collectively referred to hereinafter as "Proprietary Property"), is the exclusive property of RightCHOICE. To protect RightCHOICE's investment of resources in developing the Proprietary Property, Hospital shall not disclose, directly or indirectly, any aspect or portion of the Proprietary Property, tangible or intangible, to any third party except as is otherwise expressly permitted by the terms and conditions of this Agreement. Hospital shall not in any manner use the Proprietary Property for itself or the benefit of others (except as expressly contemplated in this Agreement in connection with its participation in the applicable Company Program), or develop or contribute to the development of, any program, compensation model or similar plan that is based upon, reflective of, or modeled in any manner after the Proprietary Property. Hospital shall be responsible and liable to RightCHOICE for the actions of its employees, contractors, agents, directors, officers, and shall take all measures necessary to ensure that such parties are aware of and observe the provisions of this Section 6.10. This Section 6.10 survives the termination of this Agreement.

6.11   Interpretation. Ambiguity as to the meaning of any of the provisions contained in this Agreement will not be interpreted against one party or the other party solely by virtue that such party may have originally drafted the specific provision in question.

6.12   Third Party Beneficiaries. This Agreement is entered into by and between the parties signing it and for their benefit and the benefit of each Company. Except as specifically provided in Section 4.8 of this Agreement, there is no intent by either party to create or establish third party beneficiary status or rights or their equivalent in any Covered Person or third party, other than a Company, that may be affected by the operation of this Agreement, and no such Covered Person or third party shall have any right to enforce any right or claim any benefit created or established under this Agreement.

6.13   Review. Hospital hereby acknowledges that Hospital was allowed at least thirty (30) days to review this Agreement prior to Hospital's execution hereof.

6.14   Dispute Resolutions.

(a)   Except as provided below or superseded by applicable law, any controversy, claim or dispute ("Dispute") between or involves the parties must be resolved or settled in accordance with this Section 6.14. If the Dispute pertains to a matter which is generally administered by a Company's programs or policies, such as a credentialing, utilization management or quality improvement program, the procedures set forth as part of that policy or program must be fully exhausted by Hospital before Hospital may pursue the dispute resolution procedures hereafter contained in this Section 6.14.

(b)   If the Dispute is not resolved to the reasonable satisfaction of a party after exhausting the procedures under the Company's program or policy, either party may request, in writing, within the thirty (30) day period following the date on which the final determination is made under the applicable program or policy that the parties meet and confer in good faith to resolve the Dispute. If no program or policy pertains to the subject matter of the Dispute, either party may request, in writing, such a meeting at any time after the applicable business personnel of the parties are unable to reach an acceptable resolution of the Dispute. After the making of any such request, the parties will meet and confer, in good faith, at a time and place mutually acceptable to them, in an effort to resolve the Dispute.

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000016

DOJCGH_0001030854

(c) In the event that the Dispute is not satisfactorily resolved pursuant to Section 6.14(b) above within the thirty (30) day period following the date on which the request for a meeting was given, the Dispute shall only be pursued by either or both parties through binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, except as set forth below or otherwise agreed in writing by the parties. If a party intends to pursue arbitration of the Dispute, such person must notify the other(s), in writing, of its intent to arbitrate the Dispute at least thirty (30) days before submitting the Dispute to binding arbitration. Such written notice must be given prior to the date when under relevant law the institution of a legal, equitable or administrative proceeding or action with respect to the Dispute would be barred under the applicable statute of limitations (or a similar limitation). Arbitration under this provision will be final and binding, and conducted in a city in a State in which Hospital is located. Each person shall bear its, his or her respective arbitration expenses and each shall pay its, his or her pro rata portion of the arbitrator's charges and expenses, unless otherwise required by law. The arbitrator(s) may construe or interpret, but shall not vary or ignore, the provisions of this Agreement and shall be bound by and follow controlling law. The arbitrator(s) shall not award punitive or exemplary damages of any kind, except those expressly authorized by a statute that is directly applicable to the Dispute. The parties, on behalf of themselves and those that they may now or hereafter represent, each agree to and do hereby waive any right to pursue, on a class basis, any Dispute. The parties hereby consent to the jurisdiction of the courts in the State(s) in which Hospital is located and of the United States District Courts in the State(s) in which Hospital is located for injunctive, specific enforcement, or other relief in furtherance of the arbitration proceedings or to enforce judgment of the award in such arbitration proceeding. Judgment on the award rendered may be entered in any court having jurisdiction thereof.

(d) Notwithstanding the foregoing, a Dispute involving the termination of Hospital is not subject to this Section 6.14, but is subject to the hearing and appeal procedures referenced in the other applicable provisions of this Agreement, if any, and neither party is prohibited from seeking injunctive relief to prevent, or upon the occurrence of, any actual or perceived breach of or default under Section 2.4 or 2.9 of this Agreement.

(e) In the event any provision of this Section 6.14 will render invalid or unenforceable the other provisions of this Section 6.14, such provision will be construed by limiting or reducing it as necessary for this Section 6.14 to be enforceable, or such provision will be removed if it cannot be limited or reduced for this Section 6.14 to be enforceable, and the remaining provisions of this Section 6.14 will remain in full force and effect. This provision survives the termination of this Agreement.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

FOIA CONFIDENTIAL TREATMENT REQUESTED
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

RCMC0000017

DOJCGH_0001030855

05/29/2008  10:35  3149236750     NETWORK DEVELOPMENT     PAGE 03/03

**THIS AGREEMENT MAY BE SUBJECT TO APPROVAL
BY THE DEPARTMENT OF INSURANCE**

*THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION,
WHICH MAY BE ENFORCED BY THE PARTIES.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth beneath their respective signatures.

| Putnam County Memorial Hospital | RIGHTCHOICE MANAGED CARE, INC. |
|---|---|
| (Legibly Print Name of Hospital) | |
| Hospital Signature: *Katherine A Smith* | Signature: *[signed]* |
| Print Name: Katherine A Smith | Print Name: Ruth Meyer Hollenback |
| Title: COO | Title: Vice President, Health Services |
| Date: 5/27/08 | Date: 6-10-08 |
| Address: 1926 Oak Street | Effective Date of this Agreement: July 1, 2008 |
| (Please Print Legibly) Unionville, MO 63565 | |

As of the effective date of this Agreement, Hospital will be designated as a "Participating Hospital" in the following Company Programs that are initialed below by both Hospital and RightCHOICE:

|  | (Hospital Use Only) | (RightCHOICE Use Only) |
|---|---|---|
|  | Hospital: | RightCHOICE: |
| Alliance Program: | /S | /S |
| AllianceCHOICE Program: | n/a | n/a |
| HMO Program: | /S | /S |
| Regular Program (or Traditional Program): | /S | /S |
| Medicare Advantage | G | n/a |

**ATTACHMENTS:**

Exhibit A – Prospective Payment Schedules
Exhibit B – Multi-District Litigation Settlement Agreement Addendum

17

FOIA CONFIDENTIAL TREATMENT REQUESTED                                    RCMC0000018
CONTAINS HIPPA PROTECTED HEALTH INFORMATION

DOJCGH_0001030856

## Exhibit A Prospective Payment Schedule

The following rate schedule represents the maximum reimbursement amounts for the provision of Covered Services to Covered Individuals in the Plan Programs identified below. Each amount is all inclusive and covers all services (technical and professional components) and supplies provided to a Covered Individual. All ICD-9, CPT and other code descriptions set forth below or referenced on this Plan Compensation Schedule are subject to change, and will generally be made at the time of the Plan's periodic system updates. Such updates may result in the addition or deletion of some or all of the codes set forth below. The codes listed below are for reference purposes only and are not necessarily a complete listing of the codes for a particular service category.

### SECTION I - HOSPITAL AND CERTAIN HEALTH SERVICES

### Putnam County Memorial Hospital

**Rate Schedule Effective Date:   July 1, 2008**

| Type of Service | Notes | Rate Type | Alliance Program Rates | HMO Program Rates | Regular Program Rates | Codes |
|---|---|---|---|---|---|---|
| **1. INPATIENT BED ADMISSION (7, 10)** | | | | | | |
| Medical | | Per Diem | $ 950.00 | $ 823.00 | $ 1000.00 | ICD-9 Surgery Codes Available Upon Request: Rev. Codes 0110, 0111, 0120, 0121 |
| Surgical | | Per Diem | $ 950.00 | $ 823.00 | $ 1000.00 | Rev. Codes 0110, 0111, 0120, 0121 |
| Tertiary – ICU, CCU, PICU | | Per Diem | $ 1072.00 | $ 979.00 | $ 1000.00 | Rev. Codes 0200, 0201, 0202, 0203, 0207, 0208, 0209, 0210, 0211, 0212, 0213, 0219 |
| Stepdown/Telemetry | | Per Diem | $ 935.00 | $ 880.00 | $ 900.00 | Rev. Codes 0206, 0214 |
| Detained Baby/Nursery Level I | | Per Diem | $ 286.00 | $ 253.00 | $ 350.00 | Rev. Codes 0170, 0171, 0179 |
| Independent Well Newborn | | Per Diem | $ 253.00 | $ 253.00 | $ 500.00 | Rev. Codes 0170, 0171, 0179 with ICD-9 diagnosis V30-V39.2 |
| Maternity – Vaginal – (Mom Only) Two day | | Per Case | $ 1700.00 | $ 1694.00 | $ 1900.00 | Rev. Codes 0112, 0122, 0132, 0142, 0152 with ICD-9 Codes 72-73.2, 73.22-73.99, 75.5-75.69 |
| Maternity - C-Section – (Mom Only) Four day | | Per Case | $ 2600.00 | $ 2600.00 | $ 2900.00 | Rev. Codes 0112, 0122, 0132, 0142, 0152 with ICD-9 Codes 74 - 74.2, 74.4 -74.9, 74.99 |
| Subacute Maternity – Each subsequent day after the days included in the Vaginal or C-Section Inpatient Stay | | Per Diem | $ 400.00 | $ 400.00 | $ 400.00 | Use Maternity Rev. Codes and ICD-9 Procedure Codes |
| Skilled Nursing/Subacute Care | 8 | Per Diem | $ 280.00 | $ 280.00 | $ 350.00 | Rev. Codes 0190, 0191, 0192, 0193, 0194, 0199 |
| Rehabilitation | | Per Diem | $ 380.00 | $ 300.00 | $ 430.00 | Rev. Codes 0118, 0119, 0128, 0129, 0138, 0139, 0148, 0149, 0158, 0159 |
| Implant Carveout: | 11 | Percent of Payable Charges | 55% | 55% | n/a | Rev. Codes 0274-0276, 0278 |
| High Cost Drug Carve-out (See Exhibit A-1) | 5, 6 | Per Dose or Injection | AWP | AWP | n/a | Rev. Code 0636 (Only Codes on the list) |
| **2. OUTPATIENT SERVICES (7, 10)** | | | | | | |
| Ambulatory Surgery/Surgicenter | 2 | Percent of Payable Charges up to Maximum Payment, except where provided otherwise | 75%/$1,500.00 | 75%/$1,200.00 | $ 1200.00 | Rev. Codes 0360, 0369, 0490–0499, 0790, 0799 |

## Putnam County Memorial Hospital

### Rate Schedule Effective Date:   July 1, 2008

| Type of Service | | Notes | Rate Type | Alliance Program Rates | HMO Program Rates | Regular Program Rates | Codes |
|---|---|---|---|---|---|---|---|
| | Emergency Room | | Percent of Payable Charges up to Maximum Payment, except where provided otherwise | 70%/$400.00 | 70%/$350.00 | $ 400.00 | Rev. Codes 0450, 0456, 0459 |
| | Endoscopy | 3 | Per Case | $ 400.00 | $ 350.00 | $ 400.00 | Rev. Codes 0750-0759 or 0360, 0369, 0490-0499 with CPT Codes on Endoscopy Code List |
| | Outpatient Minor Surgery | 3 | Per Case | $ 250.00 | $ 200.00 | $ 300.00 | Rev. Code 0361 or 0360, 0369, 0490-0499 with CPT Codes on Minor Procedure Code List |
| | Observation | 4 | Percent of Payable Charges up to Maximum Payment | 75%/$950.00 | 75%/$823.00 | 90%/$870.00 | Rev. Codes 0760, 0762, 0769 |
| | Speech Therapy | | Per Visit | $ 64.00 | $ 58.00 | $ 72.00 | Rev. Codes 0440-0449 |
| | Occupational Therapy | | Per Visit | $ 64.00 | $ 58.00 | $ 72.00 | Rev. Codes 0430-0439 |
| | Physical Therapy | | Per Visit | $ 64.00 | $ 58.00 | $ 72.00 | Rev. Codes 0420-0429 |
| | Implant Carveout | 11 | Percent of Payable Charges | 55% | 55% | n/a | Rev. Codes 0274-0276, 0278 |
| | TPA | 5, 6 | Per Injection | AWP | AWP | n/a | Rev. Code 0636 plus J2997 |
| | Other Outpatient Services | | Percent of Payable Charges | 75% | 70% | 90% | All other Outpatient services not otherwise herein defined |

CONFIDENTIAL

PCMC0000123